UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

| | |
|---|---|
| TODD A. SARTI, Individually and on Behalf of All Others Similarly Situated,<br><br>                              Plaintiff,<br><br>                    v.<br><br>DOW INC., THE DOW CHEMICAL COMPANY, JIM FITTERLING, JEFFREY L. TATE, and KAREN S. CARTER,<br><br>                              Defendants. | Case No.<br><br><u>**CLASS ACTION COMPLAINT**</u><br><br><u>**JURY TRIAL DEMANDED**</u> |

Plaintiff Todd A. Sarti ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Dow Inc. and The Dow Chemical Company ("TDCC" and, together with Dow Inc., "Dow" or the "Company"), analysts' reports

1

and advisories about the Company, and information readily obtainable on the Internet.  Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Dow securities between January 30, 2025 and July 23, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      Dow is an American materials science company, serving customers in the packaging, infrastructure, mobility, and consumer applications industries.  Dow conducts its worldwide operations through six global businesses organized into three operating segments: (i) Packaging & Specialty Plastics, (ii) Industrial Intermediates & Infrastructure, and (iii) Performance Materials & Coatings.

3.      Historically, Dow has touted its "industry-leading dividend," which is of particular importance to investors.  On conference calls with investors and analysts, Dow's Chief Executive Officer ("CEO"), Defendant Jim Fitterling ("Fitterling"), has variously stated that the Company's "dividend is a key element of

2

our investment thesis," and that "north of 65% of our owners count on that dividend."

4.      Notwithstanding an ongoing slump in the materials science industry, as well as the recent onset of tariff-related market uncertainties, at all relevant times, Defendants represented that Dow was well positioned to weather macroeconomic and tariff-related headwinds while maintaining sufficient levels of financial flexibility to support the Company's lucrative dividend.  Specifically, Defendants cited various purported strengths and advantages unique to Dow in its industry, including, *inter alia*, the Company's purported "differentiated portfolio," "cost-advantaged footprint," and "industry-leading flexibility to navigate global trade dynamics."

5.      Throughout the Class Period, Defendants made materially false and misleading statements regarding Dow's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Dow's ability to mitigate macroeconomic and tariff-related headwinds, as well as to maintain the financial flexibility needed to support its lucrative dividend, was overstated; (ii) the true scope and severity of the foregoing headwinds' negative impacts on Dow's business and financial condition was understated, particularly with respect to competitive and pricing pressures, softening global sales and demand for the Company's products, and an oversupply of products

in the Company's global markets; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

6.     On June 23, 2025, BMO Capital ("BMO") downgraded its recommendation on Dow to "Underperform" from "Market Perform" while also cutting its price target ("PT") on the Company's stock to $22.00 per share from $29.00 per share, citing sustained weakness across key end markets and mounting pressure on the Company's dividend.

7.     On this news, Dow's stock price fell $0.89 per share, or 3.21%, to close at $26.87 per share on June 23, 2025.

8.     Then, on July 24, 2025, Dow issued a press release reporting its financial results for the second quarter ("Q2") of 2025.  Therein, Dow reported a non-GAAP[1] loss per share of $0.42, significantly larger than the approximate $0.17 to $0.18 per share loss expected by analysts.  Dow also reported net sales of $10.1 billion, representing a 7.3% year-over-year ("Y/Y") decline and missing consensus estimates by $130 million, "reflecting declines in all operating segments."  The Company further reported, *inter alia*, that "[s]equentially, net sales were down 3%, as seasonally higher demand in Performance Materials & Coatings was more than offset by declines across the other operating segments."  Defendant Fitterling blamed these disappointing results on "the lower-for-longer earnings environment that our

---

[1] "GAAP" refers to generally accepted accounting principles.

industry is facing, amplified by recent trade and tariff uncertainties," while providing a dour outlook marked by "signs of oversupply from newer market entrants who are exporting to various regions at anti-competitive economics."

9. In a separate press release issued the same day, Dow revealed that it was cutting its dividend in half, from $0.70 per share to only $0.35 per share, citing the need for "financial flexibility amidst a persistently challenging macroeconomic environment."

10. Following these disclosures, Dow's stock price fell $5.30 per share, or 17.45%, to close at $25.07 per share on July 24, 2025.

11. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

12. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

13. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

14. Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b). Dow is headquartered in this

District, Defendants conduct business in this District, and a significant portion of Defendants' actions took place within this District.

15.    In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## **PARTIES**

16.    Plaintiff, as set forth in the attached Certification, acquired Dow securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

17.    Defendant Dow Inc. is a Delaware corporation with principal executive offices located at 2211 H.H. Dow Way, Midland, Michigan 48674.  Dow Inc.'s common stock trades in an efficient market on the New York Stock Exchange ("NYSE") under the ticker symbol "DOW."

18.    Defendant TDCC is a Delaware corporation and Dow Inc.'s wholly owned direct subsidiary.  Dow Inc. conducts all of its business through TDCC, and Dow Inc. and TDCC share the same principal executive offices.  TDCC's 0.500% Notes due March 15, 2027, 1.125% Notes due March 15, 2032, 1.875% Notes due March 15, 2040, and 4.625% Notes due October 1, 2044 trade in an efficient market

on the NYSE under the ticker symbols "DOW/27," "DOW/32," "DOW/40," and "DOW/44," respectively.

19.     Defendant Fitterling has served as Dow's CEO and Chair of the Company's Board of Directors at all relevant times.

20.     Defendant Jeffrey L. Tate ("Tate") has served as Dow's Chief Financial Officer at all relevant times.

21.     Defendant Karen S. Carter ("Carter") has served as Dow's Chief Operating Officer at all relevant times.

22.     Defendants Fitterling, Tate, and Carter are collectively referred to herein as the "Individual Defendants."

23.     The Individual Defendants possessed the power and authority to control the contents of Dow's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of Dow's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Dow, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were

then materially false and misleading.  The Individual Defendants are liable for the false statements and omissions pleaded herein.

24.     Dow and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

25.     Dow is an American materials science company, serving customers in the packaging, infrastructure, mobility, and consumer applications industries.  Dow conducts its worldwide operations through six global businesses organized into three operating segments: (i) Packaging & Specialty Plastics, (ii) Industrial Intermediates & Infrastructure, and (iii) Performance Materials & Coatings.

26.     Historically, Dow has touted its "industry-leading dividend," which is of particular importance to investors.   On conference calls with investors and analysts, Dow's CEO, Defendant Fitterling, has variously stated that the Company's "dividend is a key element of our investment thesis," and that "north of 65% of our owners count on that dividend."

27.     Notwithstanding an ongoing slump in the materials science industry, as well as the recent onset of tariff-related market uncertainties, at all relevant times, Defendants represented that Dow was well positioned to weather macroeconomic and tariff-related headwinds while maintaining sufficient levels of financial

flexibility to support the Company's lucrative dividend.  Specifically, Defendants cited various purported strengths and advantages unique to Dow in its industry, including, *inter alia*, the Company's purported "differentiated portfolio," "cost-advantaged footprint," and "industry-leading flexibility to navigate global trade dynamics."

**Materially False and Misleading Statements Issued During the Class Period**

28.    The Class Period begins on January 30, 2025, when Dow issued a press release during pre-market hours reporting its financial results for the fourth quarter ("Q4") of 2024.  The press release quoted Defendant Fitterling as stating, *inter alia*[2]:

> ***Despite persistently weak macroeconomic conditions, Team Dow delivered our fifth consecutive quarter of [Y/Y] volume growth, leveraging our cost-advantaged footprint to capture resilient demand for high-value applications.*** In December, we signed a definitive agreement for the sale of a minority stake in select U.S. Gulf Coast infrastructure assets for expected cash proceeds of up to approximately $3 billion. The partnership represents a new business model ***designed to drive operational efficiencies and growth with new customers, while providing near-term financial flexibility***. We also announced a strategic review of select European assets, and today we are announcing additional actions to deliver $1 billion of targeted cost reductions. ***These collective actions represent a continuation of Dow's commitment to maintaining our strong financial foundation*** and supplementing near-term cash flow.

29.    With respect to Dow's outlook for 2025, the same press release quoted Defendant Fitterling as stating:

---

[2] All emphases herein are added unless otherwise indicated.

> *We remain confident that Dow will benefit from the completion of our near-term incremental growth projects and an enhanced focus on operational discipline in 2025. In addition, we are optimistic that we will see further demand growth in attractive end markets such as packaging, energy and electronics . . . . Our differentiated portfolio and strong balance sheet enable us to deliver on all our capital allocation priorities, including an industry-leading dividend.* Until we see more definitive indications of a true recovery taking hold – and in order to deliver improved margins – we are taking actions to reduce our costs by $1 billion as well as our 2025 CapEx [capital expenditure] plans by $300 - 500 million. We will complete these actions while staying the course on our long-term strategic priorities. Our proactive interventions are necessary for Dow to continue to successfully navigate this economic downcycle.

30.    The same day, also during pre-market hours, Dow hosted a conference call with investors and analysts to discuss its Q4 2024 financial results.  During his prepared remarks on the call, Defendant Fitterling continued to tout Dow's ability to "deliver . . . [Y/Y] volume growth despite continued weak macroeconomic conditions" and ultimately "foster a sustainable future, achieve long-term profitable growth, and enhance shareholder returns."  He likewise continued to tout Dow's "near-term growth investments" that "will enable improved underlying earnings and margins across the cycle," Dow's "differentiated portfolio and proactive actions to support our solid financial foundation," and Defendants' purported "confiden[ce] in our ability to deliver on all of our capital allocation priorities, including our industry-leading dividend."

31.    Similarly, during his prepared remarks, Defendant Tate downplayed concerns with demand and sales across Dow's various markets notwithstanding

deteriorating macroeconomic conditions and headwinds.  For example, with respect to Dow's Packaging & Specialty Plastics segment, Defendant Tate acknowledged that, "[i]n China, manufacturing activity remains tepid and overall demand in Europe continues to be soft," but that, "in packaging, we continue to see demand growth, especially in North America with resilient domestic and export polyethylene demand throughout the year."

32.    With respect to Dow's Industrial Intermediates & Infrastructure segment, Defendant Tate reassured investors that "planned maintenance activity scheduled at our ethylene oxide asset in . . . Texas . . . will enable the start-up of additional alkoxylation capacity in the US Gulf Coast," touting "[t]his new capacity" as one of several "near-term growth investments" that purportedly "should support higher sales beginning in the second-quarter" of 2025.

33.    In addition, with respect to Dow's Performance Materials & Coating segment, Defendant Tate represented that "we expect the seasonal demand uptick in [the] first quarter [of 2025] to provide a tailwind of approximately $75 million" notwithstanding "soft[ness]" in "building and construction end-markets" and "high mortgage rates in the US and sector weakness in China."

34.    On the same call, in response to an analyst's question regarding whether "if demand is unfortunately similar in 2025 versus 2024, . . . directionally, should

11

EBITDA [earnings before interest, taxes, depreciation, and amortization] be up, down, flat," Defendant Fitterling stated, in relevant part:

> On 2025 versus 2024, obviously, a big part of the $1 billion of cost actions we're taking are to underpin improved EBITDA in 2025. So *we've got volume growth and I mentioned the projects that we'll have starting out this year, which all of them will be able to be sold-out and be accretive from the point that they start-up. So you'll have that.* We're obviously not counting on a tremendous amount, *although we've shown five consecutive quarters of volume growth. So we're still going to keep taking advantage of our low-cost position and get our share.* But I think pricing power is the real question and that's the reason for the cost action is to underpin the improvement in EBITDA.
>
> I would say you also have to think about the markets and a lot will depend on demand in the markets. In PNSP [Packaging & Specialty Plastics], well, I'd say in the ethylene chain, in general, *PNSP and ethylene oxide derivatives have continued to be strong. You see that strength in Industrial Solutions. You see that strength.* Although we had some pricing slip in the fourth quarter. *Overall, we see that strength in the integrated margins of PNSP. So I think that will continue to be a positive sign.* I think we'll continue to take the actions that we need to take in Europe to tighten things up there.
>
> * * *
>
> And then, of course, cash, we're going to manage very carefully, which is why you saw the CapEx reductions that we announced to try to stay in a better cash-flow position and *keeping our dividend strong is one of the number one priorities*.

35.    Further, in response to another analyst's inquiry regarding "the risk and potential mitigation activities you could do around tariffs, specifically around Canada," Defendant Fitterling attested to Dow's visibility into tariff-related impacts on the Company's business while downplaying the same, stating, in relevant part:

I think the most important thing is what we're doing right now, which is engage with the administration on providing data for ourselves and also for the industry to understand the situation. ***And we're starting to see every day like more refinement on what's happening.*** I think it's pretty clear in the near-term of the discussion is around getting control over immigration and the flow of fentanyl into United States.

36.    On February 4, 2025, Dow filed an annual report on Form 10-K with the SEC, reporting the Company's financial and operating results for its Q4 and full year ended December 31, 2024 (the "2024 10-K").   The 2024 10-K contained substantively the same statements made by Defendant Fitterling as referenced in ¶ 29, *supra*, with respect to Dow's outlook for 2025, touting the Company's purported "near-term incremental growth projects," expectations for "demand growth in attractive end-markets," and ability to maintain "an industry-leading dividend" by virtue of its purported "differentiated portfolio and strong balance sheet."

37.    With specific respect to Dow's outlook for its Packaging & Specialty Plastics segment in 2025, the 2024 10-K stated, in relevant part:

In Packaging & Specialty Plastics, ***supply improvements driven by new polyethylene capacity coming online during 2025, combined with improved reliability, will allow the Company to continue to drive volume growth and improve margins***. Local prices are expected to be impacted by market supply and demand dynamics as well as volatility in feedstocks due to sensitivity to external economic and geopolitical factors. ***The Company's feedstock flexibility and advantaged regional footprint will continue to position the segment well to navigate market dynamics throughout the year. In-region presence and superior derivative flexibility will allow the segment to continue to optimize price and volume mix.***

38.    Likewise, with respect to Dow's outlook for its Industrial Intermediates & Infrastructure segment in 2025, the 2024 10-K stated, in relevant part:

> In Industrial Intermediates & Infrastructure, *improved demand is expected based on improving fiscal conditions* resulting from interest rate cuts across several regions. *The Company will benefit from the full-year impact of resumed production at the Louisiana Operations Glycol-2 unit in Plaquemine, Louisiana*, which successfully restarted in June 2024. *Recent and in-flight growth investments in specialty amines and alkoxylation capacity are expected to support long-term, above GDP volume growth in key markets* including energy transition, pharmaceuticals and consumer health, and sustainable surfactants.

39.    Similarly, with respect to Dow's outlook for its Performance Materials & Coatings segment in 2025, the 2024 10-K stated, in relevant part:

> In Performance Materials & Coatings, the Company will continue to prioritize key end-markets in performance silicones in which its *innovation and footprint can drive value and volume growth above GDP. Pricing for specialty products is expected to remain relatively stable, with anticipated modest but steady economic expansion. Volume growth is expected in feedstocks and intermediates on improved regional supply and demand dynamics*, and while competitive pressures in the market impacting local price persist, *lower interest rates are expected to drive improved demand and local price. Market conditions impacting sales of coatings are expected to improve compared with recent years* based on lower interest rates and an increase in residential spending.

40.    Appended as exhibits to the 2024 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Fitterling and Tate certified that the 2024 10-K "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading

with respect to the period covered by this report"; and that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of [Dow] as of, and for, the periods presented in this report."

41.     On April 24, 2025, Dow issued a press release reporting its financial results for the first quarter ("Q1") of 2025.  The press release quoted Defendant Fitterling as stating, in relevant part:

> We remain focused on disciplined execution and increased actions to improve profitability and support cash flow . . . . ***Despite ongoing macroeconomic challenges, Team Dow delivered a sixth consecutive quarter of [Y/Y] volume growth while taking actions to reduce costs and right-size capacity* . . . . *Today's announcements build on Dow's cost actions that are already underway, aiming to further strengthen our financial flexibility and support a balanced capital allocation approach.***

42.     Also on April 24, 2025, Dow hosted a conference call with investors and analysts to discuss its Q1 2025 financial results.  During his prepared remarks on the call, Defendant Fitterling downplayed the true scope and severity of the deteriorating macroeconomic environment's impact on the Company's business and financial condition, while overstating the Company's ability to weather the same. For example, Defendant Fitterling stated, *inter alia*:

> ***[I]n the face of volatile macroeconomic conditions, team Dow focused on operational discipline while taking actions to reduce costs and align capacity to the slower GDP conditions that are impacting our industry. We delivered our sixth consecutive quarter of [Y/Y] volume growth*** . . . . Sequentially, net sales were flat. This reflected lower

pricing in industrial intermediates and infrastructure and performance materials and coatings, *which was offset by downstream growth in silicones as a result of improvements in home and personal care and electronic end markets, as well as seasonally higher demand in building and construction and DIC*.

\* \* \*

As our industry weathers the current challenging conditions, we're executing several proactive and decisive actions to improve margins support near-term cash flow, and optimize our global portfolio. We're doing so today in a manner that is consistent with our best owner mindset and a balanced capital allocation approach. *Our purpose-built asset footprint and our low-cost feedstock positions primarily in The Americas and The Middle East, create a meaningful cost advantage for Dow and provide industry-leading flexibility to navigate global trade dynamics.* We're focused on improving our margins by reducing our spending and matching regional supply to profitable demand. As we've outlined throughout today's call, we have line of sight to $6 billion in near-term cash flow improvement.

\* \* \*

The Dow team is closely monitoring the current uncertain macro environment and *we're taking the necessary actions to further improve our competitive position* including looking for additional ways to reduce costs, and increase our competitiveness. Our near-term strategic priorities are focused on navigating the challenges our industry is facing. *By delaying the Alberta project, maintaining financial flexibility, protecting our balance sheet, rationalizing assets in high-cost regions, reducing costs, and focusing on profitable growth, we are positioning Dow for long-term success through the cycle.*

43.    During her prepared remarks on the same call, Defendant Carter similarly touted "the [purported] power of [Dow's] competitive advantages and track

16

record of solid execution in various market conditions" notwithstanding a weak macroeconomic environment and tariff-related uncertainties, stating, *inter alia*:

> We are moving with urgency to deliver strong operational and financial results through this persistent down cycle. ***We are taking a hard look at everything across the enterprise with a sharp focus on driving volume growth, capturing price, and taking actions in the near term that will enhance profitability and improve margins***. We will continue to accelerate our cost savings actions and are looking for additional opportunities to build on what we are already delivering.
>
> \* \* \*
>
> ***In addition to the comprehensive set of actions underway, we are adjusting our business to current market realities by leveraging our strategic asset footprint global reach, low-cost position, and unmatched feedstock flexibility. More specifically, we have a leading or low-cost position and world-class manufacturing sites in every geography, with well-developed, agile regional supply chain. And a deep understanding of the needs of our customers.*** And are the only company with integrated polyethylene production on four continents. In addition, ***Dow's unique feedstock flexibility allows us to optimize our assets based on regional advantages. We have the ability to crack the most optimal fee slate. And have the widest range to take advantage of dynamic periods.***
>
> ***This ability to capitalize on preferred feedstocks, paired with our breadth of process technologies, enables Dow to optimize what, where, and how we produce our products*** to best serve our customers. And while the tariff environment remains fluid, we estimate greater than 95% of our North American volume is USMCA [United States–Mexico–Canada Agreement] compliant ***which is an advantage for Dow . . . . [W]e have engaged in rigorous scenario planning to identify potential additional cost pressures and mitigation strategies. Altogether, our unmatched cost position and feedstock flexibility superior product mix, and geographic diversity are strong differentiators that give Dow a competitive edge today and throughout the cycle.***

44.    Similarly, during his prepared remarks on the same call, Defendant Tate, *inter alia*, asserted that "[w]e still expect demand to be positive for the year," notwithstanding "global demand remain[ing] well below historical average GDP levels" and "[r]ecent disruption from tariffs," reiterated that "Dow's global footprint with low-cost assets in all regions should position us well to navigate current market dynamics," and assured investors that, "[s]hould we gain insights into substantial changes during the quarter, we're committed to maintaining transparency, and we'll provide timely updates accordingly."

45.    In addition, Defendant Tate represented that Dow enjoyed "important flexibility in the midst of this low-growth environment, and increased macroeconomic and geopolitical uncertainty" as a result of "Dow's commitment to financial discipline" and "proactive actions we're taking to effectively manage this extended down cycle" which were "expect[ed] . . . to provide approximately $6 billion in near-term cash support"—all of which overstated Dow's financial stability and ability to maintain its dividend despite ongoing macroeconomic and tariff-related headwinds.  Indeed, as Defendant Tate concluded in his prepared remarks:

> Our collective actions to navigate the realities of the current macroeconomic environment and deliver $6 billion in cash support over the next two years, enable Dow to maintain our financial flexibility. Our balance sheet remains solid, with no substantive debt maturities due until 2027 . . . .
>
> We will continue to seek options where Dow can proactively take action to improve our capital structure ***through this type of activity or***

18

*derisking as we've done in the past*. We remain focused on delivering on our balanced capital allocation approach over the cycle.

46.   Later during the call, Defendants Fitterling and Carter continued to downplay macroeconomic and tariff-related concerns in response to related questions by analysts.  For example, Defendant Fitterling stated, *inter alia*:

> We have an advantage in that we have footprint Canada, US, Argentina, Middle East. **We have the ability to flex the supply chain and to mitigate tariff impacts on where we export our materials.**
>
> **So it's very positive.** We also have the advantage that greater than 95% of everything we move between The United States and Canada is USMCA compliant. **So I think those things will have a positive impact.** But we just need a little bit better clarity on where these tariffs land and what that impact is on overall demand.
>
> * * *
>
> **[We h]ave a very active tariff and trade team that is engaged on all sides of that.** And, of course, a lot comes down to what's gonna be on an exemption list, and what isn't gonna be on an exemption list. **So we're optimistic that some discussions will start, and we'll get some clarity around that as the quarter develops. In the meantime, we're doing things that we need to do to flex that supply chain.**

47.   Similarly, Defendant Carter stated, *inter alia*:

> **[W]e are well on our way on reconfiguring our supply chain.** The team has been working since really, you know, the middle of the first quarter. On this. **And so we are able to export quite a bit more product out of Canada. And then, of course, in The United States, our low-cost position enables us to produce for the local demand.** As a matter of fact, the growth project that [Defendant Fitterling] alluded to, Poly seven, that's going to start up in the second quarter is going to provide us even more flexibility to supply even more of that U.S. demand right here. And then, of course, we've got, you know, four on four continents sprayed a polyethylene production. So think about The Middle East as

well. ***As an opportunity for us to supply demand around the world but also direct in China***.

***So we are well positioned. We feel good about where we are. And able to mitigate the tariffs directly.***

\* \* \*

[In] our industrial solutions business . . . , ***although we are seeing softening demand, we are seeing awful pockets of stability***. Markets like energy, home care, and pharma end markets. ***Data centers, an example, is a significant growth opportunity for us***, and our solutions there are used in things like thermal management. I do just, though, just wanna double down the new asset that we're gonna start up there here in the second quarter. In The U.S. For new alkoxylation capacity. That unit is going to focus on growth and attractive end markets for us. So home and personal care and pharma. And, really, the good news around that asset is about 50% of that capacity is already contracted for. ***We expect that to provide us with a tailwind going into the second half.***

48.    The statements referenced in ¶¶ 28-47 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) Dow's ability to mitigate macroeconomic and tariff-related headwinds, as well as to maintain the financial flexibility needed to support its lucrative dividend, was overstated; (ii) the true scope and severity of the foregoing headwinds' negative impacts on Dow's business and financial condition was understated, particularly with respect to competitive and pricing pressures, softening global sales and demand for the Company's products, and an oversupply of products

in the Company's global markets; and (iii) as a result, Defendants' public statements were materially false and misleading at all relevant times.

49.    In addition, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Dow to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  Defendants failed to disclose, *inter alia*, Dow's actual ability (or lack thereof) to mitigate macroeconomic and tariff-related headwinds, as well as maintain the financial flexibility needed to support its lucrative dividend. Defendants also failed to disclose the true scope and severity of the foregoing headwinds' negative impacts on Dow's business and financial condition, particularly with respect to competitive and pricing pressures, softening global sales and demand for the Company's products, and an oversupply of products in the Company's global markets.  Defendants' failure to disclose these issues violated Item 303 because these issues represented known trends or uncertainties that were likely to have a material unfavorable impact on the Company's business and financial results.

## The Truth Emerges

50.    On June 23, 2025, during pre-market hours, BMO issued a report on Dow, downgrading its recommendation on the Company to "Underperform" from

"Market Perform" while also cutting its PT on the Company's stock to $22.00 per share from $29.00 per share, stating, *inter alia*:

> The significant weakness across [Dow's] end-markets resulting in soft pricing and lower vol[ume]s/op[erating] rates is likely to result in severely challenged [second quarter] EBITDA and [second-half-of-2025] estimates coming solidly lower. Looking at 2026, barring a change in the macro (or significant supply closures), we believe DOW's 2026 EBITDA is set to come in ~$1b[illio]n below consensus. Finally, with no end in sight for these anemic earnings levels, there appears a heightened risk DOW may cut the dividend.

51.    On this news, Dow's stock price fell $0.89 per share, or 3.21%, to close at $26.87 per share on June 23, 2025.

52.    Then, on July 24, 2025, during pre-market hours, Dow issued a press release reporting its financial results for Q2 2025 (the "Q2 2025 Earnings Release"). Therein, Dow reported a non-GAAP loss per share of $0.42, significantly larger than the approximate $0.17 to $0.18 per share loss expected by analysts. Dow also reported net sales of $10.1 billion, representing a 7.3% Y/Y decline and missing consensus estimates by $130 million, "reflecting declines in all operating segments." The Company further reported, *inter alia*, that "[s]equentially, net sales were down 3%, as seasonally higher demand in Performance Materials & Coatings was more than offset by declines across the other operating segments."

53.    Defendant Fitterling, as quoted in the Q2 2025 Earnings Release, blamed these disappointing results on "the lower-for-longer earnings environment that our industry is facing, amplified by recent trade and tariff uncertainties," while

disclosing that "[w]e are . . . adjusting our dividend to ensure we maintain a balanced capital allocation framework" and to "provide additional financial flexibility to help guarantee we maximize shareholder value, both in the current environment and as the industry recovers."  As quoted in the same press release, Defendant Fitterling also provided a dour outlook going forward, citing "signs of oversupply from newer market entrants who are exporting to various regions at anti-competitive economics" and the need for "broader industry engagement and additional regulatory action to restore competitive dynamics."

54.    In a separate press release issued the same day, also during pre-market hours, Dow revealed that it was cutting its dividend in half, from $0.70 per share to only $0.35 per share, citing the need for "financial flexibility amidst a persistently challenging macroeconomic environment."

55.    The foregoing disclosures shocked investors and analysts alike. Indeed, within approximately an hour after markets opened on July 24, 2025, multiple analysts expressed surprise over Dow's disappointing results.  For example, a Citi analyst noted that "[w]hile expectations were already low, DOW's [Q2 2025] earnings came in well below that, as pricing pressure continued to challenge" and the Company missed "against a lowered bar."  Likewise, a Vital Knowledge analyst characterized Dow's Q2 2025 results as "pretty bad" and falling short "across the board," stating that "[t]he company didn't come close to earning the dividend."

56.     Indeed, following publication of the Q2 2025 Earnings Release and Dow's announcement that it was cutting its dividend in half, the Company's stock price fell $5.30 per share, or 17.45%, to close at $25.07 per share on July 24, 2025.

57.     The following day, in an article entitled "Dow Price Targets Fall Post-Earnings," *Bloomberg* reported that **fourteen** analysts had cut their PT on the Company's stock by an average of ***13%***.

58.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

59.     During the Class Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  Indeed, during the Class Period, while disseminating the materially false and misleading statements alleged herein to maintain artificially inflated prices for Dow's securities, Defendants represented that they had visibility into ongoing macroeconomic and tariff-related headwinds that were impacting nearly every, if not every, aspect of the Company's business, and were successfully mitigating the same.  Defendants also simultaneously reassured investors regarding Dow's maintenance of the requisite financial flexibility to

support the Company's dividend—a dividend that Defendants acknowledged was of paramount importance to investors and the Company's investment thesis.

60.    Accordingly, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

61.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired Dow securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

62.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Dow securities were actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records

maintained by Dow or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

63.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

64.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

65.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Dow;

- whether the Individual Defendants caused Dow to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Dow securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

66.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

67.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Dow securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Dow securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

68.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

69.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

70.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

71.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

72.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a

fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Dow securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Dow securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

73.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Dow securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Dow's finances and business prospects.

74.     By virtue of their positions at Dow, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

75.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of Dow, the Individual Defendants had knowledge of the details of Dow's internal affairs.

76.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Dow.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Dow's businesses, operations, future financial

condition and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Dow securities was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning Dow's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Dow securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

77.    During the Class Period, Dow securities were traded on an active and efficient market.   Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Dow securities at prices artificially inflated by Defendants' wrongful conduct.   Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.   At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Dow securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.   The market

price of Dow securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

78.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

79.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

80.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

81.    During the Class Period, the Individual Defendants participated in the operation and management of Dow, and conducted and participated, directly and indirectly, in the conduct of Dow's business affairs.  Because of their senior positions, they knew the adverse non-public information about Dow's misstatement of income and expenses and false financial statements.

82.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Dow's financial condition and results of operations, and to correct promptly any public statements issued by Dow which had become materially false or misleading.

83.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Dow disseminated in the marketplace during the Class Period concerning Dow's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause Dow to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Dow within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Dow securities.

84.    Each of the Individual Defendants, therefore, acted as a controlling person of Dow.  By reason of their senior management positions and/or being directors of Dow, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Dow to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Dow and possessed the power to control the specific

activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

85.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Dow.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  August 29, 2025

Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff*