**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| TODD A. SARTI, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DOW INC., JIM FITTERLING, and JEFFREY L. TATE,<br><br>Defendants. | ) | No. 1:25-cv-12744-RJW-PTM<br><br>CLASS ACTION<br><br>Honorable Robert J. White<br>District Judge<br><br>Honorable Patricia T. Morris<br>Magistrate Judge |

**AMENDED CLASS ACTION COMPLAINT**
**FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

**Page**

NATURE OF THE ACTION .......... 2

JURISDICTION AND VENUE .......... 7

PARTIES .......... 8

SUBSTANTIVE ALLEGATIONS .......... 13

The Company and Its Business .......... 13

Dow Consistently Paid the $2.80 Per Share Dividend from 2019 Through the Start of the Class Period, Even Though Dow's Dividend Yield Varied .......... 15

Dow Needed to Generate Billions of Dollars of FCF Each Year to Pay the $2.80 Per Share Dividend .......... 19

Dow Generated Negative FCF in FY24, Which Caused the Company's Dividend Yield to Spike Above 6% by the Start of the Class Period .......... 21

By the Start of the Class Period, Defendants Had Repeatedly Told Investors that Dow Would Use Numerous Unique Cash Levers to Pay the $2.80 Per Share Dividend in FY25, Regardless of Dow's Financial Performance .......... 29

During the Class Period, Defendants Falsely Guaranteed to Investors that the Cash Generated by the Company's Unique Cash Levers Would Be Prioritized to Pay Dow's $2.80 Per Share Dividend in FY25 and Beyond .......... 34

Defendants Were Motivated to Deceive Investors During the Class Period .......... 46

Defendants Never Warned Investors During the Class Period that the Company's Unique Cash Levers Would Not Be Used to Pay the $2.80 Per Share Dividend in FY25 .......... 48

**Page**

In July 2025, Dow Cut the $2.80 Per Share Dividend in Half to Prioritize the $6 Billion of Cash Generated By Dow's Unique Cash Levers for Non-Dividend Purposes ....... 51

MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE DURING THE CLASS PERIOD ....... 55

ADDITIONAL SCIENTER ALLEGATIONS ....... 64

LOSS CAUSATION/ECONOMIC LOSS ....... 69

CLASS ACTION ALLEGATIONS ....... 70

NO SAFE HARBOR ....... 73

APPLICATION OF PRESUMPTION OF RELIANCE: THE *BASIC* AND *AFFILIATED UTE* PRESUMPTIONS ....... 74

COUNT I……………… ....... 76

For Violations of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants ....... 76

COUNT II……………... ....... 77

For Violations of §20(a) of the Exchange Act Against the Individual Defendants ....... 77

PRAYER FOR RELIEF ....... 78

JURY DEMAND ....... 78

Lead Plaintiff Curtis Lin ("Lead Plaintiff"), on behalf of himself and all other persons similarly situated, by Lead Plaintiff's undersigned attorneys, for Lead Plaintiff's amended complaint for violations of the federal securities laws (the "Complaint") against Defendants (defined below), alleges the following based upon personal knowledge as to Lead Plaintiff and his own acts, and upon information and belief as to all other matters based on the investigation conducted by and through Lead Plaintiff's attorneys, which included, among other things, the review and analysis of: (i) Securities and Exchange Commission ("SEC") filings made by Dow Inc. and its subsidiaries ("Dow" or the "Company"); (ii) press releases, public statements, and other publications disseminated by, or concerning, Defendants; (iii) transcripts of investor conference calls with Dow's management; (iv) information posted on Dow's corporate website; (v) securities analyst reports concerning Dow; and (vi) news articles and media coverage concerning Defendants.

The investigation of Lead Plaintiff's attorneys is continuing, yet certain additional facts supporting these allegations are known only to Defendants or are exclusively within their custody or control. Lead Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all purchasers of Dow common stock between January 30, 2025 and July 23, 2025, inclusive (the "Class Period"). Lead Plaintiff is asserting claims against Dow, Dow's CEO and Chairman of the Board of Directors (the "Board"), Jim Fitterling ("Fitterling"), and Dow's CFO, Jeffrey L. Tate ("Tate," and with Dow and Fitterling, "Defendants") under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5), as amended by the Private Securities Litigation Reform Act of 1995 (the "PSLRA").[1]

2. Dow is a chemical company that is known for continuously paying cash dividends for over 100 years. This case concerns Defendants' materially false and misleading statements and omissions during the Class Period about using cash derived from sources other than Dow's operations to pay the Company's "industry-leading" $2.80 per share annual dividend in FY25 regardless of Dow's financial performance. In reality, by the start of the Class Period, Defendants understood that Dow's poor financial performance, negative free cash flow ("FCF"), and high dividend yield meant that the Company needed to prioritize the non-operating cash Dow generated in FY25 for non-dividend purposes, and not to maintain the dividend.

---

[1] Capitalized terms used in this section are defined later in the Complaint.

3. Dow went public in 2019 following a spin-off of the Company after Dow had merged with DuPont in 2017. At the time, defendant Fitterling was named as Dow's CEO. Upon Dow's entrance to the public markets in 2019, defendant Fitterling repeatedly told investors that the Company would pay a $2.80 per share dividend (approximately $2 billion in cash) each fiscal year to investors, that this "industry-leading dividend" was the Company's top priority and primary focus, and that it was Dow's goal to increase the size of the dividend.

4. From April 2019 through the start of the Class Period in late January 2025, Dow paid the annual $2.80 per share dividend to investors, even as the Company's financial performance varied during this period.

5. In order to pay approximately $2 billion each fiscal year as a cash dividend to investors, Dow had to generate sufficient positive FCF from the Company's operations to fund the dividend.

6. For companies like Dow, whose cash dividend is the main reason to invest, a metric known as "dividend yield" (which is a percentage measurement of the annual cash dividend payout relative to the current stock price), is closely followed by investors. For example, a 5% dividend yield means that an investor is receiving a 5% return on every dollar invested in the stock. Typically, investors want a high dividend yield because that provides an attractive return and indicates a healthy company. Thus, a high dividend yield is used to entice investment.

7. For this reason, investors pay careful attention to a company's dividend yield, whose calculation is directly impacted by daily stock price movements. As a company's stock price increases, and the dividend remains fixed, the dividend yield will fall. Conversely, as a company's stock price decreases, and the dividend remains fixed, the company's dividend yield will increase.

8. An increased dividend yield that is caused by a declining stock price and related poor financial performance and insufficient FCF (as opposed to increasing because of raising the dividend), indicates that the dividend is unaffordable, *i.e.*, the increased dividend yield indicates financial distress, not success. The only way the dividend can be paid in that scenario is if the company has non-operating sources of cash to fund it and uses the cash for that purpose.

9. From April 2019 to the start of the Class Period, Dow's dividend yield fluctuated between 4% and 12%. Nonetheless, Dow consistently paid investors the $2.80 per share dividend each year. In FY24 – the fiscal year before the Class Period – Dow generated negative FCF and performed poorly. In response, Dow's dividend yield was 6% by October 2024 as the Company's stock price declined below $50.

10. But, as Defendants repeatedly told investors since April 2019, Dow had a special ability to generate non-operating cash in times of poor financial performance and negative FCF, and would use this cash to pay the $2.80 per share dividend for ***years*** until the Company's performance improved.

11. Specifically, Defendants told investors that Dow had "unique cash levers" – *i.e.*, non-operating sources of cash – that the Company would "pull" at will to provide cash when Dow needed it to pay the $2.80 per share dividend. By late 2024, Defendants guaranteed that Dow would use multiple of those cash levers to pay the $2.80 per share dividend in FY25, since insufficient FCF was expected.

12. Shortly before the Class Period, in mid-December 2024, Dow pulled the first cash lever – approximately $3 billion from an asset sale. The Class Period begins on January 30, 2025, which is the first time Defendants spoke to investors following this asset sale. In connection with the January 30, 2025 investor earnings call, Defendants announced that a second cash lever – layoffs that would save Dow $1 billion in costs – had also been pulled. Defendants told investors these cash levers would be used to pay the $2.80 per share dividend in FY25 above funding any non-dividend uses for this cash.

13. Defendants made similar materially false and misleading statements to investors in the Company's 2024 Form 10-K, filed in early February 2025, and in investor calls in mid-March 2025, early April 2025, late April 2025, and early June 2025. By late April 2025, Defendants announced that four cash levers had been pulled, amounting to ~$6 billion in non-FCF cash for FY25. Each of Defendants' misstatements and omissions misled investors by inaccurately guaranteeing that this cash would be used to pay the $2.80 per share dividend in FY25 above all else.

14. During the Class Period, Defendants possessed a powerful motive to mislead Dow's investors. Specifically, by falsely stating to investors that the $2.80 per share dividend was guaranteed to be funded by the unique cash levers in FY25, Defendants sought to convince the market that Dow's high dividend yield – the highest in the S&P 500 during the Class Period – meant the Company could afford an expensive dividend even during Dow's "downcycle" in financial performance during the Class Period, thus indicating financial strength.

15. Further indicating Defendants' fraudulent intent is Defendants' failure to provide investors with ***any*** risk warnings during the Class Period related to Dow's $2.80 per share dividend or the Company's unique cash levers. Here, Defendants affirmatively chose ***not*** to provide investors with a single risk warning during the Class Period that even mentions the words "dividend" or "cash lever," let alone provide a risk warning concerning Dow's ability to pay the $2.80 per share dividend, the use of the Company's unique cash levers to pay it, or prioritizing the use of the cash levers for non-dividend purposes.

16. Defendants' fraud unraveled pre-market open on July 24, 2025, when Dow's continued poor financial performance, inability to generate positive FCF, and high dividend yield led Defendants to cut the $2.80 per share dividend in half. In so doing, Defendants admitted that the unique cash levers were primarily needed for non-dividend purposes in FY25, not to maintain the $2.80 per share dividend.

17. In response, Dow's common stock declined by over 17%. Predictably, analysts directly linked Dow's July 24, 2025 stock price decline to the Company's decision to cut the dividend and reallocate cash. The over 17% decline made Dow the second-worst performer in the S&P 500 on July 24, 2025, and was the second largest stock price decline for Dow since the Company went public in 2019.

18. From July 24, 2025 to the present, Defendants have not once told investors that Dow provides an "industry-leading dividend."

## JURISDICTION AND VENUE

19. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§8j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

20. This Court has jurisdiction over the subject matter of this action pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1331.

21. Venue is proper in this District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b), as Dow's principal place of business is located within this District.

22. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, either directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the United

States mail, interstate telephone communications, and the facilities of the national securities exchange.

## PARTIES

23. Lead Plaintiff Curtis Lin purchased Dow common stock during the Class Period, as set forth in his certification previously filed with the Court and incorporated herein by reference, and has been damaged thereby. ECF No. 13-3.

24. Defendant Dow is a chemical company that serves customers in a variety of markets, including packaging, infrastructure, mobility, and consumer applications. Dow was incorporated on August 30, 2018, to serve as the holding company for The Dow Chemical Company and its consolidated subsidiaries ("TDCC"). Dow operates all of its business through TDCC, and solely owns all of the common shares of TDCC. All references herein to "Dow" or the "Company" necessarily encompass TDCC and its consolidated subsidiaries. Dow and TDCC are both incorporated under Delaware law, and both are located at 2211 H.H. Dow Way, Midland, MI 48674. Dow's common stock is traded on the New York Stock Exchange ("NYSE") under the symbol "DOW." According to Dow's Form 10-K for the fiscal year ended December 31, 2024, which was filed on February 4, 2025 (the "2024 Form 10-K"), the Company had 703,831,931 shares of common stock outstanding as of January 15, 2025.

25. Defendant Fitterling has served as Dow's Chief Executive Officer ("CEO") since August 2018, and the Chairman of the Board since April 2020. Defendant Fitterling has also served as TDCC's CEO since July 2018, and the Chairman of TDCC's board of directors since April 2020. According to the 2024 Form 10-K, defendant Fitterling was an executive officer of Dow during the Class Period. Defendant Fitterling signed the 2024 Form 10-K. Defendant Fitterling routinely spoke on behalf of Dow to investors during the Class Period.

26. Defendant Tate has served as Dow's Chief Financial Officer ("CFO") since November 2023. Defendant Tate has also served as TDCC's CFO since November 2023. According to the 2024 Form 10-K, defendant Tate was an executive officer of Dow during the Class Period. Defendant Tate signed the 2024 Form 10-K. Defendant Tate routinely spoke on behalf of Dow to investors during the Class Period. Defendant Tate previously worked for Dow from 1992 until August 2019 and, among other roles, was formerly the Director of Investor Relations for the Company.

27. Defendants Fitterling and Tate are collectively referred to herein as the "Individual Defendants."

28. Dow and the Individual Defendants are collectively referred to herein as "Defendants."

29. Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about its business, operations, products, operational trends, financial statements, markets and present and future business prospects via internal corporate documents (including the Company's operating plans, budgets and forecasts, and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to them in connection therewith.

30. It is appropriate to treat Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of Defendants identified in ¶¶24-26 above. Both of the above executive officers of Dow, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels and were privy to confidential proprietary information concerning the Company and its business, operations, products, growth, financial statements, and financial condition, as alleged herein. Said Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading

statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

31. As executive officers and controlling persons of a publicly-held company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, and which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

32. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their executive and

managerial positions and/or Board membership with Dow, the Individual Defendants each had access to the adverse undisclosed information about Dow's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Dow and its business materially false and misleading.

33. The Individual Defendants, because of their positions of control and authority as executive officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading before or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained herein.

34. Each Defendant is liable as a participant in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Dow common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (1) deceived the investing public regarding

Dow's financial reporting, business, operations and management and the intrinsic value of Dow's common stock; and (2) caused Lead Plaintiff and the Class to purchase Dow common stock at artificially inflated prices.

## SUBSTANTIVE ALLEGATIONS

### The Company and Its Business

35. Dow describes itself in the 2024 Form 10-K as "one of the world's leading materials science companies, serving customers in high-growth markets such as packaging, infrastructure, mobility and consumer applications."

36. The Company operates chemical manufacturing sites in 30 countries and had sales in the fiscal year ended December 31, 2024 ("FY24") of approximately $43 billion. Dow conducts its worldwide operations through three operating segments: (1) Packaging & Specialty Plastics; (2) Industrial Intermediates & Infrastructure; and (3) Performance Materials & Coatings.

37. Dow was incorporated on August 30, 2018, to serve as the holding company for TDCC and its consolidated subsidiaries. Dow operates all of its businesses through TDCC. Dow owns TDCC by owning all 100 shares of TDCC's common stock.

38. TDCC was formed in Michigan in 1897. By 2015, TDCC had become one of the largest chemical production companies in the world.

39. On December 11, 2015, TDCC announced a merger of equals with E.I. du Pont de Nemours & Company ("DuPont"), another one of the largest chemical production companies in the world (the "Merger").

40. According to TDCC, the purpose of the Merger was to combine TDCC and DuPont into a holding company under the name "DowDuPont." Following the closure of the Merger, shares of DowDuPont common stock began trading on the NYSE on September 1, 2017. Concurrently, the common stocks of TDCC and DuPont each ceased trading on the NYSE on August 31, 2017.

41. As part of the Merger, DowDuPont contemplated that each of DowDuPont's three divisions would be spun-off and become separate publicly-traded companies. DowDuPont's intended three new companies were: (1) a materials science company that would operate under the "Dow" moniker; (2) an agriculture company that would operate under the name "Corteva"; and (3) a specialty products company that would operate under the name "DuPont."

42. Following the Merger, defendant Fitterling served as the Chief Operating Officer of the Materials Science Division of DowDuPont.

43. On April 1, 2019, Dow announced that it had successfully completed its spin-off separation from DowDuPont (the "Spin"). Defendant Fitterling was concurrently announced as the initial CEO of Dow.

44. On April 2, 2019, Dow common stock began trading on the NYSE. Dow's stock price closed at $56.25 on April 2, 2019.

45. Also on April 2, 2019, Dow joined the Dow Jones Industrial Average ("DJIA") index, replacing DowDuPont. The DJIA is a stock market index of 30 prominent companies listed on United States stock exchanges that is commonly used to assess the health of the financial markets in the United States.

46. As contemplated by the Merger, Dow received ownership of all the common stock of TDCC in the Spin. Dow also received several other businesses from DowDuPont that formerly comprised its Materials Science business.

**Dow Consistently Paid the $2.80 Per Share Dividend from 2019 Through the Start of the Class Period, Even Though Dow's Dividend Yield Varied**

47. TDCC has paid cash dividends to investors every year since 1912, including through DowDuPont during the 2015 to 2019 time frame.

48. Upon becoming a publicly traded company, Dow announced, on April 11, 2019, a quarterly dividend of $0.70 per share, equating to an annual $2.80 per share dividend. According to Dow's first quarterly earnings press release, issued on May 2, 2019 on Form 8-K, this dividend "reconfirms Dow's commitment to an ***industry-leading dividend*** to its shareholders."[2]

[2] Unless otherwise noted, all emphasis is added.

49. From the Spin in 2019 until the end of the Class Period, Dow's $2.80 per share "industry-leading" dividend has been prominently featured by Dow and defendant Fitterling as the primary reason for investors – like Lead Plaintiff and the Proposed Class (defined below) – to purchase and hold Dow common stock.

50. For example, on May 2, 2019, Dow held the Company's first quarterly earnings call with investors, whereupon defendant Fitterling stated that "***[w]e confirmed an industry-leading annual dividend pay of $2.1 billion [i.e., $2.80 per share]*** . . . Our commitment to shareholder returns . . . is a top priority of the Board and the Dow management team."

51. Likewise, defendant Fitterling explained to investors during the Company's third quarterly earnings call, on October 24, 2019, that he took steps to get Dow "on solid financial footing as a new company . . . to make sure that, that ***industry-leading dividend*** that we put out there was protected. And I believe that we've done that."

52. In addition, defendant Fitterling told investors during the Company's fourth quarterly earnings call, on January 29, 2020, that "***[t]he dividend remains our #1 priority***."

53. And during Dow's first annual shareholders meeting, on April 9, 2020, defendant Fitterling told investors that "***[o]ur priority uses for cash have not changed . . . We will protect the dividend[.]***"

54. Before the Class Period, defendant Fitterling even told investors that the $2.80 per share dividend would increase over time. During a March 14, 2023 investor conference, in response to a question about defendant Fitterling's "thoughts about the dividend longer term," he responded "[t]he Board long term wants to see us grow into a bigger dividend."

55. In addition, before the Class Period, Defendants also repeatedly recognized the importance of Dow's $2.80 per share dividend to investors, like Lead Plaintiff and the Proposed Class.

56. For example, during Dow's corporate investor day on May 16, 2024 (the "2024 Investor Day"), defendant Fitterling stated that:

> ***An awful lot of our shareholder base historically has really valued the dividend and the return of the dividend.*** And these are – they want secure, long-term, well-managed lower risk investments to put in. This isn't – I wouldn't compare it to a bond, but I would say they want better return than bond yield but they want to know that it's a well-managed company, and they can generate that higher return. And they can look to that. Maybe it's a pension plan. Maybe it's an investment portfolio or an index fund which is really more concerned about cash generation back to that shareholder. I hope, in the scenario that you described, I hope we get to that space. I hope that with the growth that we talked about on EBITDA, ***we're able to not just keep the dividend and support it, but we can increase it over time***.

57. According to a *Barrons* article dated March 29, 2019 (the "March 2019 Article"), Dow's dividend was the principal reason to purchase Dow common stock. The March 2019 Article stated that "[t]he new Dow is enticing because it is expected

to carry a dividend yield of more than 5% - one of the highest among major companies in the basic materials sector."

58. The March 2019 Article further emphasized that "Dow is serious about its dividend. While the payout hasn't been set, Dow has said that it plans $2.1 billion annually in dividends, which should amount to about $2.80 per share, based on an estimated 750 million shares outstanding. That would work out to a 5.6% yield at the current share price of $50 . . . . Dow's expected dividend of 5.6% would exceed the 4.8% of its closest rival, LyondellBasell Industries (LYB)."

59. "Dividend yield" is calculated by dividing the current annual dividend for a common stock by the current price per share. By multiplying the output of that number by 100, the result is a percentage that analysts and investors use to assess the dividend yield for a particular company.

60. From April 2019 until October 2024 – consisting of 23 consecutive financial quarters – Dow paid common stock investors a quarterly dividend of $0.70, equating to an annual dividend of $2.80 per share.

61. As the price of Dow common stock (and, by proxy, the Company's financial performance) fluctuated during the time period of April 2019 to the start of the Class Period in January 2025, so too did Dow's dividend yield.

62. For example, on the close of trading on March 16, 2020, Dow's stock price was $22.00 per share, equating to a dividend yield of approximately 12.7%.

63. Likewise, when Dow's financial performance was strong – such as on May 4, 2022, when Dow's stock priced closed at $70.61 per share – the Company had a dividend yield of approximately 3.9%.

64. Accordingly, by the start of the Class Period in January 2025, Dow had established a track record of maintaining and paying the $2.80 per share dividend notwithstanding fluctuations in the Company's dividend yield.

**Dow Needed to Generate Billions of Dollars of FCF Each Year to Pay the $2.80 Per Share Dividend**

65. Before the Class Period, Dow explained to investors that the Company funded the $2.80 per share dividend (comprising over $2 billion in cash) with FCF generated by operations.

66. FCF is the amount of cash that a company has left after excluding non-cash expenses on a company's income statement (such as capital expenditures, or "CapEx"). Thus, FCF represents the funds that a company has available to, among other things, pay cash dividends to investors.

67. As Dow explained in the 2024 Form 10-K, "[t]he generation of cash from operations . . . is expected to meet the Company's cash requirements for . . . dividend distributions to stockholders[.]" The 2024 Form 10-K also lists FCF as "an integral financial measure used in the Company's financial planning process."

68. Because FCF is a key financial metric for Dow that was included in each of the Company's quarterly and annual reports to investors, and was the subject

of frequent investor and analyst inquiry, Defendants necessarily were apprised of Dow's FCF and other sources of cash at all relevant times during the Class Period.

69. Indeed, as defendant Fitterling admitted after the Class Period during a March 18, 2026 investor conference, Dow's management was monitoring FCF and cash performance on, at a minimum, ***a daily basis***, stating that "obviously, the other thing that people ask questions about [other than profit] is on cash flows . . . ***That's what the team and the management team is doing on a daily, weekly, monthly basis*** is to drive to those [FCF] objectives."

70. FCF is critical for investors to assess whether to invest in a company that pays a high dividend yield. A high dividend yield is attractive to investors if a company is generating FCF in excess of the company's dividend payment because that means the high dividend yield is supported by the company's healthy financial performance and the company can afford to increase the dividend.

71. By contrast, investors understand that a company with a high dividend yield, but poor or declining FCF, cannot pay the dividend because the company will need the cash to fund other aspects of the business.

72. The only scenario in which a company with a high dividend yield and poor FCF can afford its dividend is if the company has a cash source that is not FCF, *i.e.*, unique items that do not depend on the underlying financial performance of the

company's business to generate cash, and commits to use that cash to pay the dividend until FCF recovers.

73. Accordingly, Defendants (and Dow's investors) were highly attuned to Dow's dividend yield, FCF performance, and commitment to fund the $2.80 per share dividend at all relevant times, including at the start of the Class Period.

**Dow Generated Negative FCF in FY24, Which Caused the Company's Dividend Yield to Spike Above 6% by the Start of the Class Period**

74. As alleged in ¶¶65-73 above, before the Class Period, and following the Spin, defendant Fitterling repeatedly emphasized to investors the importance of Dow's FCF performance.

75. For example, during Dow's investor earnings call on January 27, 2022, to discuss the Company's financial results for the fiscal year ended December 31, 2021 ("FY21"), defendant Fitterling reported "significant cash generation for the quarter, with cash flow from operations of $2.6 billion, up $901 million year-over-year," which allowed Dow to pay shareholders "$512 million through our ***industry-leading dividend[.]***" As of the end of FY21, defendant Fitterling reported that Dow had "achieved $7.1 billion of cash flow from operations, bringing our total cash flow from operations since spin to $18 billion."

76. Likewise, during Dow's investor earnings call on January 26, 2023, to discuss the Company's financial results for the fiscal year ended December 31, 2022, ("FY22"), Dow's former CFO preceding defendant Tate, Howard I. Ungerleider

("Ungerleider"), stated: "I'm very proud of the Dow team on their focus on cash flow. When you look at what we've been able to do since spin, we have actually improved our cash from ops every single year, 2019 through 2022. And last year was $7.5 billion of cash from ops and $400 million better overall than 2021."

77. Defendants were fully aware of Dow's FCF performance at all relevant times before and during the Class Period. As Ungerleider told investors during a July 25, 2023 quarterly earnings presentation, "***every single leader in our company that manages the P&L now manages the cash flow and that rolls up to the one that Jim [Fitterling] and I and the leadership team are responsible for***."

78. During the January 25, 2024 investor earnings call to discuss Dow's financial results for the fiscal year ended December 31, 2023 ("FY23"), defendant Fitterling stated that "***we delivered on all of our capital allocation priorities, including a fully funded dividend[.]***"

79. On January 25, 2024, Dow's dividend yield was approximately 5.1%.

80. In connection with Dow's investor earnings call on April 25, 2024, Dow provided an investor presentation that told investors "***Dow Remains A Compelling Investment Opportunity***" because, among other things, the Company's "***[d]ivdend yield [is] well covered by free cash flow generation***[.]"

81. In addition, the April 25, 2024 investor presentation noted Dow's strong FCF performance from FY21 to FY23 versus the Company's peers, and promoted Dow's "[a]bove [a]verage [d]ividend [y]ield":







Source: Dow data, FactSet, Company disclosures

82. Further, during the 2024 Investor Day in May 2024, defendant Fitterling led with Dow's FCF performance when "start[ing] with the progress that we made since [S]pin. Team Dow has generated more than $20 billion of cumulative free cash flow."

83. But by late 2023, Dow's FCF performance had begun to dramatically decline. As reflected in the chart below, which is sourced from the FCF results reported by Dow on Form 8-K for each fiscal quarter of FY22, FY23, and the fiscal year ended December 31, 2024 ("FY24"), although the Company had generated approximately $20 billion of cash from operations from the Spin in April 2019 through FY23, Dow's FCF had evaporated and turned negative by early FY24:




84. As reflected in the above chart, Dow's FCF in FY24 – the fiscal year preceding the start of the Class Period – was ***negative*** $37 million.

85. Thus, Dow did not generate enough FCF to pay the $2.80 per share dividend to investors in FY24.

86. Nonetheless, Dow paid the $2.80 per share dividend to investors during FY24.

87. Since Dow did not generate at least $2.1 billion in FCF during FY24, the only way to convince investors that the $2.80 per share dividend would be paid in FY25 is if the Company had alternative methods to generate cash.

88. As Defendants told investors throughout FY24, instead of using FCF to pay the $2.80 per share dividend, the Company would rely on "cash levers" that were "unique to Dow" to generate cash in FY24 and FY25.

89. As FY24 progressed, these unique Dow cash levers became increasingly material and important to the Company's investors because, by the end of FY24, they had replaced FCF as the funding source for Dow's $2.80 per share dividend.

90. For example, during the 2024 Investor Day in May 2024, defendant Tate told investors that "we currently have over $1.5 billion in unique to Dow levers that will further enhance our cash flow."

91. Next, during the July 25, 2024 investor earnings call to discuss Dow's financial results for the second fiscal quarter of FY24 ("2Q24"), defendant Tate again sought to reassure investors by stating that "in the near term, we expect to enhance our cash flow generation by executing over $1.5 billion in unique-to-Dow levers."

92. As Dow's FCF performance continued to decline throughout FY24, Defendants provided more certainty about the Company's unique cash levers being

used to fund the $2.80 per share dividend in FY25. During the October 24, 2024 investor earnings call to discuss Dow's financial results for the third fiscal quarter of FY24 ("3Q24"), defendant Tate told investors that "[w]e also expect to enhance our near-term cash flow generation through the execution of unique-to-Dow total cash flow levers."

93. Likewise, according to defendant Fitterling during the October 24, 2024 investor earnings call, Dow was "actively progressing our unique-to-Dow cash flow levers and [we] expect to share more by the end of the year."

94. In response to an analyst's question on the October 24, 2024 investor earnings call about "how should we think about net cash flow next year?" in light of the Company's $64 million in FCF for 3Q24 (and negative FCF through that point in FY24), defendant Tate responded as follows:

> Short answer on the unique-to-Dow cash levers is, yes, we would expect to have a similar type of proceed coming back from some of the activities that we're focused on. Some of those that we've mentioned in the past that we're still working on besides the non-product producing infrastructure assets would be looking at our Nova judgment and continuing to make progress on that as well as looking at some of our joint venture restructuring activities that could also give us some cash opportunities.
>
> ***And so with those unique-to-Dow cash levers plus expecting our cash conversion rates to be similar or higher versus what we had this year, coming off of whatever our 2025 ultimate EBITDA plan is will give us the opportunity to be able to support our cash usage for 2025.***

95. In other words, defendant Tate informed investors that Dow's unique cash levers would be the primary source of cash to support the Company's $2.80 per share dividend in FY25, including during the Class Period.

96. The presentation accompanying the October 24, 2024 investor earnings call provided additional specificity for two of Dow's near-term unique cash levers that investors would receive an update on by the end of FY24: (1) an "infrastructure asset sale (>$1B)" that was "progressing well"; and (2) "Nova judgement (~$0.5B) . . . awaiting final ruling[.]"

97. The "Nova judgment" refers to a lawsuit between Dow and NOVA Chemicals Corporation pending in Alberta, Canada, which Dow told investors had resulted in a large cash damages award that would be paid to the Company in FY25 (the "Nova Litigation").

98. By late 2024, analysts recognized that the unique cash levers were needed for Dow to pay the $2.80 per share dividend in FY25. For example, Barclays stated in an October 24, 2024 report on Dow that "[Year-to-date] FCF is -$81m . . . Dow emphasized on the call its ability to bridge the gap through ongoing 'unique-to-Dow cash flow levers' such as ongoing infrastructure asset sales, the pending ~$500m Nova litigation settlement, and potential proceeds from the strategic review of European II&I assets."

99. Likewise, Evercore stated in an October 24, 2024 report on Dow that "***[f]ocus on the unique free cash levers to grow amidst '25 cash flow statement tightness . . . [this] will be an increasingly important part of investor discussions***."

100. In addition, Jefferies stated in an October 25, 2024 report on Dow that "Dow expects to have levers to generate ~$5bn in cash flow from company-specific initiatives through at least 2030 (likely easing a bit if utilization rates improve)."

101. From the beginning of FY24 to October 24, 2024, Dow's common stock price traded in a range of a high of $59.99 (equaling a dividend yield of approximately 4.7%) and a low of $50.15 (equaling a dividend yield of approximately 5.6%).

102. Following the October 24, 2024 earnings call for 3Q24, and in light of Dow's continued inability to generate positive FCF, Dow's stock price declined below $50 per share on October 28, 2024. Thereafter, Dow's common stock price remained below $50 for the rest of FY24 and continued to decline, closing at $40.13 per share on December 31, 2024.

103. From October 28, 2024 through the present, Dow's common stock has not traded above $50 per share.

104. On November 8, 2024, Dow was replaced in the DJIA index by The Sherwin-Williams Company.

105. On November 19, 2024, *Bloomberg News* reported that "Dow Hits 52-Week Low at $43.61." By this date, Dow's dividend yield had climbed to approximately 6.4%.

106. By December 31, 2024, Dow's dividend yield was approximately 6.9%.

107. Accordingly, by the start of the Class Period, investors understood that Dow's inability to generate positive FCF and related poor financial performance meant that Dow's unique cash levers were necessary to pay the $2.80 per share dividend in FY25.

**By the Start of the Class Period, Defendants Had Repeatedly Told Investors that Dow Would Use Numerous Unique Cash Levers to Pay the $2.80 Per Share Dividend in FY25, Regardless of Dow's Financial Performance**

108. As Dow's dividend yield increased beyond 6%, this indicated that the $2.80 per share dividend was unaffordable because of the Company's inability to generate positive FCF.

109. To counter that conclusion, starting in late 2024, the Individual Defendants and the Company's investor relations team repeatedly and emphatically told investors that Dow's $2.80 per share dividend would be covered by the cash generated from the Company's unique cash levers in FY25, regardless of Dow's financial performance.

110. According to a November 20, 2024 report on Dow by BMO Capital Markets (the "November 2024 BMO Report"), "***[w]e recently spent time with DOW's CFO Jeff Tate and Andrew Riker & Tiago Tenuto from IR.*** DOW covered a host of topics including . . . FCF generation ***(and the levers DOW has that will enable it to continue to return meaningful cash to shareholders)***."

111. The November 2024 BMO Report further stated that defendant Tate personally met with Dow investors on November 20, 2024, and expressed "complete confidence in support of the dividend" because the unique Dow cash levers would give the Company "***several years***" of cash to "***more than cover the dividend***," as follows:

> Cash Flows: Given DOW's noteworthy 6.4% dividend yield and an over-leveraged peer's recent cut to the dividend, ***the topic of DOW's FCF was a topic covered by many of the investors DOW met. Mr. Tate spoke to complete confidence in support of the dividend highlighting the following:*** with the $1B of incremental EBITDA in 2025, the company should see total EBITDA equating to roughly $6.5B and based on its usual cash conversion of near 80%, this results in ~$5B of CFFO (give or take). With $3.5B of capex that leaves the company with $1.5B of cash for the $2B of dividends. ***That said, the company has notable other levers to pull during this "below mid-cycle" earnings period, including the sale of non-production assets and JV restructuring that management expects to take place. Management spoke to having "several years" of these $1B+ asset sales/JV restructurings to come, which would more than cover the dividend.*** They also highlighted the pending ruling on the Nova suit to likely come in 2025 (we estimate this could add ~$500mm of cash). ***Finally, in the off chance of a significant macro downturn, DOW can dial back some of its growth capex — this is definitely not on the drawing board in the current environment but demonstrates the levers***

> ***available if necessary.*** With all of this, while CFFO may be a bit on the modest side, ***it is clear that DOW's dividend looks secure.***

112. In other words, as recounted in the November 2024 BMO Report, defendant Tate guaranteed to Dow common stock investors that the Company would use unique cash levers to fund the $2.80 per share dividend in FY25 and beyond, regardless of Dow's financial performance in FY25.

113. Shortly thereafter, on December 3, 2024, defendant Tate participated at the Citi Basic Materials Conference (the "December 2024 Citi Conference"), and told investors that Dow was close to pulling an over $1 billion cash lever.

114. Specifically, defendant Tate stated during the December 2024 Citi Conference that "in the near term, we expect to unlock additional cash proceeds from our non-product-producing assets at an attractive multiple in the US Gulf Coast . . . once completed, this latest transaction will enhance our cash flow generation by more than $1 billion in proceeds."

115. Defendant Tate reiterated during the December 2024 Citi Conference that "[w]e also remain committed to our industry-leading dividend[.]" Defendant Tate cited Dow's "additional levers that will unlock cash in the near term to support cycle volatility" as the reason why "we're confident we can continue to deliver on our capital allocation framework."

116. On December 9, 2024, Dow filed a press release on Form 8-K (the "December 2024 Press Release") and announced the Company had pulled the first

cash lever discussed during the December 2024 Citi Conference. Specifically, according to the December 2024 Press Release, Dow sold a 40% minority stake in certain Dow U.S. Gulf Coast infrastructure assets to Macquarie Asset Management ("Macquarie") for $2.4 billion in proceeds, and the potential to generate up to approximately $3 billion in proceeds if Macquarie later decides to increase the minority stake to 49% (the "Macquarie Asset Sale").

117. In response, investors and analysts immediately interpreted the Macquarie Asset Sale to mean that Dow would fund the Company's $2.80 per share dividend in FY25, notwithstanding Dow's financial performance. Effectively, the Macquarie Asset Sale indicated to investors that Dow could withstand at least a few years of additional negative financial performance before the Company's inability to generate positive FCF would threaten the $2.80 per share dividend.

118. For example, Barclays stated in a December 9, 2024 report on Dow that:

> **At a high level, we expect investors to view this transaction favorable:** a) initial cash proceeds of $2.4bn exceed prior company guidance of ~$1bn in infrastructure-related asset sales, exemplifying management's focus on "unique-to-Dow" cash levers and b) it helps quell recent investor concerns around the free cash flow bridge / Dow's ability to fund the dividend through the ongoing cylical trough.

(Emphasis in original).

119. Likewise, BMO Capital Markets stated in a December 9, 2024 report on Dow that investors remained intently focused on the Company's use of the cash levers to supply the missing cash to fund the $2.80 per share dividend, as follows:

> As we highlighted in [the November 2024 BMO Report], ***investors have been focused on DOW's lofty 6-7% dividend yield and were actively questioning whether DOW would have the cash to cover such a lofty dividend.*** At the time, Jeff Tate spoke to a number of non-production assets/levers that DOW would look to sell that would fund billions of proceeds over the next few years – something we had indicated should calm investors concerns. ***Today's asset sale fulfills DOW's commitment and should reduce concerns around the stability of the dividend, in our view.***

120. In addition, Morgan Stanley stated in a December 9, 2024 report on Dow that investors needed reassurance about the $2.80 per share dividend in light of the Company's spiking dividend yield, and that the Macquarie Asset Sale accomplished precisely that, as follows:

> The company had indicated for some time now that it was pursuing another sale of non-product producing assets, but we believe that investors expected such sale to generate proceeds similar to the combined proceeds of the prior two sales (*i.e.*, rail infrastructure of $310 million and US Gulf Coast marine and terminal operations for $620 million). As such, the proceeds of $2.4-$3.0B for 40-49% of the assets in question is likely well ahead of investor expectations. *We have been fielding increased questions over Dow's cash flow statement in recent months, and in particular, following Celanese's November 4, 2024 dividend cut (i.e., DOW shares down 12.5% since then and ~25% since October).*
>
> (Emphasis in original).

121. Further, UBS stated in a December 9, 2024 report on Dow that "[l]ooking forward, with the prospect of >$2B of incoming cash, ***this should more than cover uncertainty in dividend coverage over the next year***."

122. Also Barclays stated in a December 13, 2024 report on Dow that the Macquarie Asset Sale proved that "***Dow is comfortably able to bridge the gap at trough for another 1-2 years (if needed)***, between cash flow levers such as the recent infrastructure sale for $2.4bn[,]" which was critical because the analyst had "***fielded many questions in recent weeks about the dividend sustainability (~7% yield)[.]***"

123. And Evercore stated in a December 17, 2024 report on Dow that the "***$2.4 Bn sale of infrastructure shored up any concerns on dividend surety in '25.***"

124. Accordingly, by January 2025, investors and analysts were told by Defendants that Dow would use the Company's unique cash levers to generate billions of dollars of cash to prioritize payment of the $2.80 per share dividend in FY25, notwithstanding Dow's negative FCF performance, spiking dividend yield, and poor financial performance in FY25.

**During the Class Period, Defendants Falsely Guaranteed to Investors that the Cash Generated by the Company's Unique Cash Levers Would Be Prioritized to Pay Dow's $2.80 Per Share Dividend in FY25 and Beyond**

125. When the Class Period started on January 30, 2025, Dow's dividend yield rose above 7% as the Company's common stock price continued to decline through the end of January 2025.

126. As a result, Dow sought to reassure investors in late January 2025 that the Company had additional cash levers, in addition to the Macquarie Asset Sale, to pay the $2.80 per share dividend in FY25.

127. On January 30, 2025, before the open of trading, Dow issued a press release on Form 8-K announcing that the Company had pulled a second cash lever by taking several steps, including reducing Dow's workforce by 1,500 roles globally, to achieve $1 billion in cost savings (the "January 2025 Cash Lever Press Release").

128. The timing of the January 2025 Cash Lever Press Release was not coincidental. That same morning, also before the open of trading, Dow issued a press release on Form 8-K announcing the Company's financial results for 4Q24 (the "January 2025 Earnings Press Release"). The January 2025 Earnings Press Release reported only $44 million in FCF for 4Q24, meaning that Dow confirmed ***negative*** $37 million in FCF for FY24.

129. The January 2025 Earnings Press Release directly linked the $1 billion in cost savings cash lever to Dow's ability to pay the Company's "***industry-leading dividend***" in FY25.

130. During the accompanying investor earnings conference call on January 30, 2025, also before the open of trading (the "January 2025 Earnings Call"), defendant Fitterling made several material misstatements and omissions to convince

investors and analysts that the Company's unique cash levers would be used to pay the $2.80 per share dividend above all other commitments in FY25.

131. Specifically, defendant Fitterling falsely stated that: (1) pulling the cash levers amounted to "proactive actions to support our solid financial foundation . . . including our industry-leading dividend"; (2) "keeping our dividend strong is one of the number 1 priorities"; and (3) "we listen very carefully to what [Dow common stockholders] want to see . . . [which is] why [the $2.80 per share dividend is] a top priority for us."

132. Defendants' materially false and misleading statements and omissions on January 30, 2025 caused analysts to report that the unique cash levers would be used to pay the $2.80 per share dividend in FY25 above all else.

133. For example, Barclays titled a January 30, 2025 report on Dow "4Q Review: Exit from Trough Still Pending; ***Pulling Further Cash Levers to Support Dividend***."

134. Likewise, BMO Capital Markets stated in a January 30, 2025 report on Dow that "[m]anagement is taking steps to reduce cash uses and shore up cash flows to improve their financial position. This along with potential asset sales should ***ease near-term investor concerns around DOW's dividend payout. . . . Overall, via various cash flow measures management underscored the importance of their dividend payout***."

135. In addition, Evercore stated in a January 30, 2025 report on Dow that "***dividend surety concerns have been address[ed] for '25[.]***"

136. According to a January 30, 2025 J.P. Morgan report on Dow (the "January 2025 J.P. Morgan Report"), the $2.80 per share dividend directly supported Dow's then-current common stock price: "***Dow's shares are supported by the 7.3% dividend yield***" and "***Dow's share price is supported by its large ~$2.1b dividend***" (partial emphasis in original).

137. The January 2025 J.P. Morgan Report further linked the materiality of Dow's $2.80 per share dividend to the Company's common stock price by reporting that "***[a]n increase or decrease to the dividend would materially impact the valuation of DOW shares***."

138. Thus, at the start of the Class Period, the use of the Company's unique cash levers to pay Dow's $2.80 per share dividend in FY25 was among the most material facts for investors in the Company's common stock.

139. Indeed, as defendant Fitterling stated during the January 2025 Earnings Call, "***north of 65% of our owners count on that [$2.80 per share] dividend***."

140. Instead of accurately informing Dow's common stock investors that the Company's unique cash levers would not be used to pay the $2.80 per share dividend in FY25, and rather were needed for non-dividend purposes, Defendants chose to continue to mislead investors during the remainder of the Class Period by falsely

reiterating that Dow's unique cash levers would be used to pay the $2.80 per share dividend in FY25 above all else.

141. To that end, on February 10, 2025, Dow's Vice President of Investor Relations, Andrew Riker ("Riker"), and Senior Director of Investor Relations, Scott Snyder, met with Morgan Stanley analysts to discuss the Company (the "February 2025 Morgan Stanley Report").

142. According to the February 2025 Morgan Stanley Report, Riker left no doubt that Dow would use the unique cash levers to pay the $2.80 per share dividend in FY25 above all else, as follows:

> On capital deployment, ***Dow notes that they expect that the dividend is safe and the company would take further action to protect the dividend if needed.*** Specifically, following the infrastructure sale, ***Dow sees the balance sheet as in a fine position to support the dividend this year and next.***

143. On March 13, 2025, defendant Tate participated at the J.P. Morgan 2025 Industrials Conference (the "March 2025 Conference"). During the March 2025 Conference, defendant Tate confirmed that the third cash lever for FY25 had been pulled by reporting that the Nova Litigation would return more than $500 million to Dow and would "be a 2025 cash flow item for the company."

144. In response, during the March 2025 Conference, a J.P. Morgan analyst asked about Dow's $2.80 per share dividend. Defendant Tate falsely replied that he wanted to be "***crystal clear***" that "[w]e remain committed to our dividend moving

forward" and that Dow's unique cash levers meant the Company was "***in a really good position to be able to support our dividend for the next several years***."

145. In other words, defendant Tate told investors that Dow would use the unique cash levers to ensure the payment of the $2.80 per share dividend not only for FY25, but "for the next several years," as opposed to prioritizing this cash for a non-dividend use.

146. J.P. Morgan stated in a March 13, 2025 report on Dow that, in light of defendant Tate's materially false and misleading statements during the March 2025 Conference, the Company "remains committed" to the $2.80 per share dividend and is "well positioned to cover [it] over the next several years" even if Dow's business continues to underperform, as follows:

> ***Dow views its dividend as key to its value proposition and remains committed to its capital allocation priorities. Dow views itself as well positioned to cover its dividend over the next several years despite the weak macro backdrop and will continue to look across its business for opportunities to release cash.***

147. Dow's dividend yield on March 13, 2025 was approximately 7.8%.

148. According to the *Motley Fool*, by March 26, 2025, Dow's common stock had the highest dividend yield in the S&P 500.

149. On April 10, 2025, Defendants participated at Dow's annual shareholder meeting (the "April 2025 Annual Meeting"). The first question posed by investors at the April 2025 Annual Meeting was "***whether Dow can afford to***

***sustain its dividend***." In response to this question, defendant Fitterling gave a resoundingly positive "yes" by falsely stating that using Dow's unique cash levers "provided us the flexibility to navigate through this extended trough" to "maintain[] an industry leading dividend [of $2.80 per share]" above all else.

150. On April 15, 2025, Dow filed a press release on Form 8-K, which announced that following the April 2025 Annual Meeting, Dow declared a quarterly dividend of $0.70 per share payable to shareholders of record on May 30, 2025. Thus, Dow maintained the $2.80 per share dividend on April 15, 2025.

151. On April 24, 2025, Dow issued a press release on Form 8-K announcing the Company's financial results for the first fiscal quarter of 2025 ("1Q25"), the period ended March 31, 2025 (the "April 2025 Press Release"). The April 2025 Press Release reported ***negative*** $581 million of FCF in 1Q25.

152. In response to Dow's continued negative FCF performance, the April 2025 Press Release announced that a fourth cash lever had been pulled for FY25 – saving $1 billion in CapEx by delaying "construction of [Dow's] Path2Zero project in Fort Saskatchewan, Alberta, Canada until market conditions improve."

153. The April 2025 Press Release informed investors that Dow had pulled four unique cash levers totaling nearly $6 billion in near-term cash "to effectively manage the extended downcycle" in Dow's financial performance that was expected to persist throughout FY25: (1) up to $3 billion from the Macquarie Asset Sale; (2)

over $1 billion from the Nova Litigation; (3) $1 billion in cost-savings; and (4) the newly announced $1 billion CapEx reduction for the Path2Zero project.

154. Unsurprisingly, the topic of Dow's unique cash levers and the $2.80 per share dividend was raised during the Company's April 24, 2025 investor earnings call to discuss Dow's 1Q24 financial results (the "April 2025 Earnings Call"). During the April 2025 Earnings Call, in response to an analyst's question about whether the "dividend [was] secure for this year and probably next," defendant Fitterling positively responded by pointing to "***$6 billion in the near term . . . the vast majority of that will come in in 2025. That will help support the dividend.***"

155. Thus, on the April 2025 Earnings Call, Defendants again inaccurately guaranteed to investors that Dow would use the $6 billion of FCF generated by the Company's unique cash levers in FY25 to pay the $2.80 per share dividend in FY25 above all else.

156. Barclays titled an April 24, 2025 report on Dow "1Q Review: ***Pulling Out All The Stops on Cash*** as Earnings Outlook Softens," which stated, in pertinent part, as follows:

> ***The message from Dow management this quarter was one of decisive actions to free up cash and navigate the prolonged downturn. Yes, capex delays and up-sized asset sales + litigation cash inflows offer a "release valve" on near-term questions about dividend sustainability (we think partly driving the ~4% rally today vs. +2% S&P as of 1pm ET), but investors remain fairly cautious about structural earnings power and the long-term costs of near-term cash harvesting levers.***

(Emphasis in original).

157. Deutsche Bank titled an April 24, 2025 report on Dow "First Take: ***Alberta Project Delay Supports the Dividend***," which stated, in pertinent part, as follows:

> Alberta project delayed. ***Dividend remains the priority***
>
> The most noteworthy and surprising aspect of the Q1 release was Dow's announcement that it was delaying construction of its flagship $7B Path2Zero Alberta project "to match market conditions". This delay will reduce capex by $600MM in '25. And coupled with a previously announced $400MM reduction in capex, Dow now expects '25 capex to be $2.5B versus its original plan of $3.5B.
>
> We believe the delay in the Alberta project and capex reduction is a clear sign of the importance Dow assigns to maintaining its dividend (current yield; 9.7%). As such, ***we do not believe the dividend is at risk in '25.***

158. RBC Capital Markets titled an April 24, 2025 report on Dow "Lowering Estimates/PT on Weak Outlook; ***Dividend Appears Intact***; Maintain SP," which stated, in pertinent part, as follows:

> [T]he **dividend appears safe following several cash actions, including delaying the Alberta project (saves $1B in 2025) and European shuts (like others) could help secure a long-elusive bottom three years in the making.**

(Emphasis in original).

159. J.P. Morgan titled an April 24, 2025 report on Dow "***Prioritizing the Dividend***," which stated, in pertinent part, as follows:

> Dow announced a postponement of the building of its $5b Alberta, Canada integrated PE project that was to come on stream in 2027 – it was a project that Dow very much wanted to build because of low-cost feedstocks, a conservative capital outlay with tax credits, and an innovative net zero carbon output. ***The market treated the decision to postpone positively. Effectively, Dow decided to prioritize its dividend, which is touching 9.4%, above its growth incentives.***

160. Indeed, BMO Capital Markets recounted in a May 7, 2025 report on Dow that during the April 2025 Earnings Call, Defendants guaranteed that the Company's unique cash levers would be used to pay the $2.80 per share dividend in FY25 even if the Company experiences "other pressures," stating, in pertinent part, as follows:

> With a 9.8% dividend, DOW has one of the biggest FCF yields in the chemical sector. ***With the dividend at nearly $2B per year, the FCF will not cover the dividend on its own over the next few years.*** However, with $2.4B from the Macquarie sale ($600mm additional potential), >$1B from the Nova settlement, and $1B in capex reduction, ***DOW should be able to keep paying its dividend even if the costs cuts (~$1B) end up being offset by other pressures (often seen in chemicals).***
>
> * * *
>
> ***Over the company's 1Q earnings call, management seemed highly committed to the dividend payout and sounded confident around ~$6B worth of cash levers it has to support the payout.***

161. On June 5, 2025, defendant Fitterling participated at the Deutsche Bank Global Industrials, Materials & Building Products Conference (the "June 2025 Conference"). During the June 2025 Conference, defendant Fitterling falsely reiterated that the Company's ability to pay the $2.80 per share dividend in FY25

and beyond was intact because of the $6 billion generated by Dow's unique cash levers, stating "***that's the reason we generated the $6 billion of interventions to say how can we make it through this year and next year and try to be secure in capital allocation***."

162. As defendant Fitterling stated during Dow's January 25, 2024 investor earnings call to discuss the Company's FY23 results, Dow's "capital allocation priorities" equate to "***a fully funded dividend***[.]"

163. And to allay any lingering concerns that investors or analysts may have had with Dow's then-current dividend yield, defendant Fitterling stated during the June 2025 Conference that "***[i]t is not unusual at the bottom of the cycle for a dividend yield on a stock price basis to get to 9%. We've seen that before***."

164. On June 5, 2025, Dow's dividend yield was approximately 9.8%.

165. On June 11, 2025, Dow issued a press release on Form 8-K and informed investors that a judgment was signed on June 10, 2025 in the Nova Litigation that apportioned approximately $1.2 billion in damages. Dow stated that the Company expected to receive this payment "in the fourth quarter of 2025."

166. In reporting on this development, BMO Capital Markets titled a June 11, 2025 report on Dow "Larger NOVA Settlement Support's Dow's Actions to Shore Up FCF in 2025," and stated, in pertinent part, as follows:

> DOW announced the figure of the final settlement proceeds with NOVA at $1.2bn. This is a bit larger than the $1.0bn modeled into the

> forecasts and further helps DOW with its FCF, balance sheet leverage, and dividend coverage. ***DOW continues to pull hard on multiple cash flow actions, which should help to protect investors' highly-coveted ~10% dividend yield and manage its balance sheet through the ongoing extended downturn.***
>
> * * *
>
> ***The NOVA settlement was expected by DOW mgmt (at >$1bn) and forms a string of actions mgmt has taken to strengthen its balance sheet and support its dividend payout in the current tough macro.*** This follows: 1) $2.4B proceeds following closing the sale of 40% stake in Diamond Infrastructure Solutions, an energy infrastructure company with pipeline, storage, water etc. focused assets. No tax leakage expected; 2) $600mm in potential additional proceeds if Macquarie decides to purchase an additional 9% stake within the next six months (most meaningful item not yet in our forecasts); 3) Targeting >$1B in cost savings by 2026 (~$300mm EBITDA benefit in 2025) through avenues like labor reductions (1,500 jobs), and other opex services curtailment. We give partial credit to this in our estimates; and 4) DOW has also delayed the construction of its Path2Zero project (~$600mm savings) in Fort Saskatchewan, and it expects total capex savings of $1B (2025 capex now at $2.5B vs $3.5B at start of the year).

167. On July 7, 2025, Dow issued a press release on Form 8-K and announced that the Company will shut down three European assets and reduce Dow's workforce by approximately 800 roles. In commenting on this news, defendant Fitterling confirmed that these moves were part of Dow's effort to enhance "cash flow through more than $6 billion in near-term cash support."

168. On July 7, 2025, Dow's dividend yield was approximately 10.2%.

169. In reporting on this development, RBC Capital Markets stated in a July 8, 2025 report on Dow that "***we maintain our perception that [Dow] should be able***

***to meet its dividend through 2026*** especially given the recent sale of its JV assets and the delay of the construction on its net-zero cracker in Alberta (~$6-7B gross capex)" (partial emphasis in original).

170. Accordingly, during the Class Period, Defendants consistently guaranteed to investors that Dow's unique cash levers would be used to pay the Company's "industry leading" dividend of $2.80 per share in FY25 over any non-dividend purposes for that cash, notwithstanding the Company's expensive dividend yield, inability to generate positive FCF, and poor financial performance.

**Defendants Were Motivated to Deceive Investors During the Class Period**

171. Defendants were highly motivated to convince the market that Dow's high dividend yield indicated that the Company was financially healthy, and not that the Company's prolonged period of poor financial performance posed a risk to the payment of the $2.80 per share dividend.

172. A high dividend yield that is being driven by poor financial performance (and negative FCF) and a related decline in share price – which describes the trajectory of Dow's dividend yield from October 2024 through the end of the Class Period – indicates that a company cannot afford to pay the dividend.

173. In that scenario, the size of the dividend will need to be reduced. By reducing the size of the dividend, a company's dividend yield will substantially decrease, thereby reducing the attractiveness of the company's dividend.

174. Conversely, if in that scenario a company can maintain the dividend, then that will cause the company's dividend yield to remain high and prove to the market that the high dividend yield indicates a sound investment.

175. Here, Defendants repeatedly (and falsely) told Dow's investors during the Class Period that the Company would use the unique cash levers to pay the $2.80 per share dividend in FY25 above all else because Defendants sought to convince investors that Dow was financially healthy enough to weather a significant period of negative FCF and poor financial performance while keeping the dividend intact.

176. Thus, Defendants falsely portrayed Dow's S&P 500-leading dividend yield (and $2.80 per share dividend) during the Class Period as a positive reason for investors to invest in Dow, and consistent with Dow being financially healthy during the Class Period.

177. In other words, Defendants' materially false and misleading Class Period misstatements and omissions were designed to hide from investors that Dow's true Class Period dividend yield should have been much lower than the lofty dividend yields that analysts were ascribing to the Company during the Class Period.

178. As recounted in the January 2025 J.P. Morgan Report, "Dow's shares are supported by the 7.3% dividend yield," meaning that Defendants necessarily understood that inaccurately portraying the Company's high dividend yield during the Class Period was artificially inflating Dow's common stock price.

179. Defendants' motivation to maintain this mirage only intensified as the Class Period progressed and Dow's dividend yield continued to increase.

180. In fact, during the June 2025 Conference, defendant Fitterling told investors that Dow's high dividend yield was consistent with Dow being a financially healthy company, telling investors that "[i]t is not unusual at the bottom of the cycle for a dividend yield on a stock price basis to get to 9% plus. We've seen that before."

181. Defendant Fitterling's statement during the June 2025 Conference confirms that Defendants sought to positively spin Dow's high dividend yield during the Class Period to investors, even as the Company was mere weeks from conceding that Dow's dividend yield had been significantly inflated during the Class Period.

182. Thus, at all relevant times during the Class Period, Defendants possessed a unique and powerful motive to mislead investors.

**Defendants Never Warned Investors During the Class Period that the Company's Unique Cash Levers Would Not Be Used to Pay the $2.80 Per Share Dividend in FY25**

183. During the Class Period, ***Defendants affirmatively chose not to provide any risk warnings related to the Company's $2.80 per share dividend or Dow's unique cash levers***.

184. Dow filed the Form 10-K for FY23 on January 31, 2024, which was signed by the Individual Defendants (the "2023 Form 10-K"). The "Risk Factors"

section in the 2023 Form 10-K contains numerous risk factors, none of which mention the words "dividend" or "cash lever," let alone risk warnings concerning Dow's ability to pay the $2.80 per share dividend or the use of the Company's unique cash levers as the source of that payment.

185. Dow filed three Forms 10-Q during FY23, on April 26, 2024, July 26, 2024, and October 25, 2024, respectively. None of the "Risk Factors" sections in these FY24 Forms 10-Q contain the words "dividend" or "cash lever," let alone risk warnings concerning Dow's ability to pay the $2.80 per share dividend or the use of the Company's unique cash levers as the source of that payment.

186. Dow filed the 2024 Form 10-K on February 4, 2025, which was signed by the Individual Defendants. The "Risk Factors" section in the 2024 Form 10-K contains numerous risk factors, none of which mention the words "dividend" or "cash lever," let alone risk warnings concerning Dow's ability to pay the $2.80 per share dividend or the use of the Company's unique cash levers as the source of that payment.

187. Instead of any risk warnings related to the $2.80 per share dividend or Dow's unique cash levers, the 2024 Form 10-K contained a materially false and misleading statement that "***[t]here are no significant restrictions limiting Dow Inc.'s ability to pay dividends***." In reality, Dow's need to prioritize the cash generated by the Company's unique cash levers for non-dividend purposes in FY25

meant there ***was*** a significant restriction on Dow's ability to pay the $2.80 per share dividend in FY25.

188. The 2024 Form 10-K did, however, explicitly state that any change in Dow's $2.80 per share dividend constitutes the type of "***information that ordinarily may be regarded as material[.]***" Thus, the 2024 Form 10-K concedes that Defendants' false and misleading Class Period statements – which center on Defendants' inaccurate guarantee that the Company would use Dow's unique cash levers to pay the $2.80 per share dividend in FY25 – challenged in this Complaint are material.

189. Dow filed a Form 10-Q for 1Q25 on April 25, 2025 (the "1Q25 Form 10-Q"). The 1Q25 Form 10-Q does not contain any risk warnings that mention the words "dividend" or "cash lever," let alone a risk warning concerning Dow's ability to pay the $2.80 per share dividend or the use of the Company's unique cash levers as the source of that payment.

190. Accordingly, Defendants' failure to provide any risk warnings during the Class Period that Dow's $2.80 per share dividend would not be paid in FY25, or that the Company's unique cash levers would not be used to pay the $2.80 per share dividend in FY25, as Defendants repeatedly guaranteed they would, further evidences Defendants' intent to defraud investors during the Class Period.

**In July 2025, Dow Cut the $2.80 Per Share Dividend in Half to Prioritize the $6 Billion of Cash Generated By Dow's Unique Cash Levers for Non-Dividend Purposes**

191. On July 24, 2025, before the open of trading, Dow issued a press release on Form 8-K announcing the Company's financial results for the second fiscal quarter of 2025 ("2Q25"), the period ended June 30, 2025 (the "July 2025 Press Release").

192. The July 2025 Press Release reported FCF of ***negative*** $1.132 billion for 2Q25.

193. Notwithstanding Defendants' many Class Period misstatements assuring investors that the approximately $6 billion of cash generated by Dow's unique cash levers would be used to pay the Company's $2.80 per share dividend in FY25 and beyond, through the July 2025 Press Release defendant Fitterling informed investors that Dow's $2.80 per share dividend was being cut for the first time since the Spin, stating, in pertinent part, as follows:

> ***We are also adjusting our dividend to ensure we maintain a balanced capital allocation framework.*** We remain committed to targeting a competitive dividend across the economic cycle. The actions we are taking provide additional financial flexibility to help guarantee we maximize shareholder value, both in the current environment and as the industry recovers.

194. Also on July 24, 2025, before the open of trading, Defendants held an investor earnings call to discuss Dow's 2Q25 financial results (the "July 2025 Earnings Call").

195. During the July 2025 Earnings Call, Defendants clarified that the $2.80 per share dividend was being reduced by 50%, to $1.40 per share. In response, Defendants received numerous requests from analysts to explain why Dow was cutting the dividend in light of the $6 billion generated by the unique cash levers, with defendant Fitterling stating as follows:

> Following a significant analysis and consideration, we announced this morning that Dow would implement a 50% dividend reduction effective in the third quarter of this year. ***This decision was not taken lightly, as we understand the importance our shareholders place on the dividend.*** And we carefully considered this on top of the financial impacts that we model.
>
> * * *
>
> ***With the earnings pressure the industry downturn has created, the fixed dollar amount of our dividend was outsized. This limited our flexibility to navigate this cycle*** and optimize total shareholder returns. Therefore, after significant and detailed analysis, Dow's Board of Directors determined that a 50% reduction in the dividend is the right move for our company and shareholders at this time.
>
> * * *
>
> Yeah, ***a lot of analysis and forward-looking modeling*** of what we thought the economic recovery was going to look like, went into that dividend reduction. And I would also say, also a clear mindset that we weren't trying to solve this equation solely with the dividend. We also have a lot in-flight in terms of cost reduction actions and restoring earnings growth.
>
> * * *
>
> On dividend, dividend yield has been an important part of our stock ownership. When you think about our institutional investors and our retail investors, ***the dividend is very significant for them.***

> And so having a leading dividend and a competitive dividend through the cycle has always been for 128 years of Dow, part and parcel, of the investment thesis. And we do generate good cash. Obviously, this is a prolonged downcycle. So I don't think it's fair to extrapolate where we are at this point in time.
>
> So I think the balance is what we're trying to strike here. ***With $2 billion moving out every year in a fixed dividend, that really put some handcuffs on us from a capital flexibility standpoint at this part of the cycle. And reducing that dividend gives us more flexibility to do other things as we navigate through.***
>
> * * *
>
> ***But the reduction in the dividend was to keep our cash flexibility through the bottom of the cycle.*** And we're trying to keep CapEx low and bring CapEx down until we see improvement in the cycle.
>
> So it wasn't our intent to be able to take that cash and redeploy it in CapEx. It was to have some flexibility. We're not doing share buybacks right now, for example. But our stocks at a price where you would want to be doing that, looking at the intrinsic values.
>
> ***And so we have no flexibility to do it if we're paying everything out as a fixed dividend.*** So that's the way we went into it with.

196. In response to the revelations in the July 2025 Press Release and the July 2025 Earnings Conference, the price of Dow common stock declined from a closing price of $30.37 per share before the announcement on July 23, 2025, to a closing price of $25.07 per share on July 24, 2025, a decline of $5.30, or 17.45%.

197. Notably, Defendants made no mention of the Company's "industry-leading dividend" in connection with the July 2025 Press Release or the July 2025 Earnings Conference, in contrast to the many statements made by Defendant before

and during the Class Period touting Dow's "industry-leading dividend," as alleged above in ¶¶47-56.

198. Even with the significant decline in Dow's common stock price on July 24, 2025, as of the end of the trading day on July 24, the dividend yield on Dow's common stock was approximately 5.6% - *i.e.*, in line with the Company's dividend yield before the Class Period in FY24.

199. Predictably, analysts directly linked Dow's stock price decline on July 24, 2025, to the Company's 50% reduction of the $2.80 per share dividend.

200. J.P. Morgan stated in a July 24, 2025 report on Dow that "[i]t seems that Dow's current reduction in its dividend was more tied to cash flow challenges . . . ***It is natural to take a new look at Dow shares now that its dividend has been cut and its shares have decreased in value***."

201. Wells Fargo stated in a July 24, 2025 report on Dow that "***We expect a negative reaction***" and, in a second July 24, 2025 report on Dow, stated that "***a strong dividend had been a selling point for the stock recently as the backdrop of chemicals remains uninspiring***."

202. RBC Capital Markets titled a July 24, 2025 report on Dow "2Q25 EBITDA ~9% Miss; 3Q25 Guide Well Below; Div Cut 50%; ***Expect Negative Reaction***."

203. Likewise, according to a July 24, 2025 *MarketWatch* article, "***[s]hares of Dow Inc. were having their worst day in five years, after the chemicals and plastics company chopped its dividend payout in half to save money, given its struggles to deal with a prolonged downturn in earnings***."

204. In addition, according to a July 24, 2025 *Dow Jones* article, Dow's stock price decline on July 24, 2025 was "[o]n pace for largest percent decrease since March 12, 2020, when it fell 15.43% . . . ***Second worst performer in the S&P 500 today***."

205. Since the end of the Class Period, Dow has twice issued earnings, on October 23, 2025, for the third fiscal quarter of 2025 ended September 31, 2025 ("3Q25"), and on January 29, 2026, for the fourth fiscal quarter of 2025 ended December 31, 2025 ("4Q25") and FY25.

206. In reporting earnings for 3Q25 and 4Q25, the phrase "industry-leading dividend" is never mentioned by Defendants.

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS MADE DURING THE CLASS PERIOD

207. The Class Period commences on January 30, 2025. On that day, before the open of trading, Defendants held the January 2025 Earnings Call. During the January 2025 Earnings Call, Defendants made materially false and misleading statements and omissions to investors by guaranteeing that Dow would use the

Company's unique cash levers to pay the $2.80 per share dividend in FY25 above all other commitments, as follows:

> In 2025, our additional cost actions and reduced CapEx spending will help us to enhance near-term cash flow, margins, and earnings growth while remaining committed to our long-term strategic priorities. In addition, our signed agreement with Macquarie Asset Management further strengthens Dow's financial flexibility and the potential to generate up to $3 billion in cash proceeds in 2025. . . . With a differentiated portfolio ***and proactive actions to support our solid financial foundation***, we are confident in our ability to deliver on all of our capital allocation priorities, ***including our industry-leading dividend.***
>
> *  *  *
>
> [Analyst]: So if demand is unfortunately similar in '25 versus '24, I mean, directionally, should EBITDA be up, down, flat? I mean, how do you sort of look at that this year?
>
> [Fitterling]: Good morning, Michael, good question. On '25 versus '24, obviously, a big part of the $1 billion of cost actions we're taking are to underpin improved EBITDA in 2025. So we've got volume growth, and I mentioned the projects that we'll have starting up this year, which all of them will be able to be sold out and be accretive from the point that they start up. So you'll have that. We're obviously not counting on a tremendous amount [of EBITDA], although we've shown five consecutive quarters of volume growth. . . . And then, of course, cash, we're going to manage very carefully, which is why you saw the CapEx reductions that we announced to try to stay in a better cash flow position and ***keeping our dividend strong is one of the number 1 priorities.***
>
> *  *  *
>
> [Analyst]: I'll probably just put a bow on the cash questions. ***There's obviously been a lot of investor focus lately around the dividend, just given the ongoing trough in your current cash generation. And Dow is obviously quite proud of maintaining an industry-leading dividend***

> ***based on your earlier comments and some of the actions you're taking to free up cash.***
>
> ***So can you maybe just lay out why Dow believes maintaining this level of dividend is sort of the best priority of cash here versus, say, using that cash for balance sheet support or even further organic growth investment?***
>
> [Fitterling]: I'll take a shot at it, and I'll ask Jeff if he wants to add anything. But north of 65% of our owners count on that dividend. And so we listen very carefully to what they want to see. And we have a lot of experience on how important the dividend is to our shareholders. ***And so that's why it's a top priority for us***.

208. The statements in ¶207 by defendants Dow and Fitterling about Dow's "proactive actions to support [Dow's] solid financial foundation . . . including our industry-leading dividend," "keeping [Dow's] dividend strong is one of the number 1 priorities," and "we listen very carefully to what [Dow common stockholders] want to see . . . [which is] why [the $2.80 per share dividend is] a top priority for us," were materially false and misleading when made because Defendants created a materially false impression that they would use Dow's unique cash levers to pay the $2.80 per share dividend in FY25 regardless of Dow's poor financial performance, negative FCF, and spiking dividend yield. In making these statements, Defendants misled investors by inaccurately guaranteeing that the cash generated by the unique cash levers would be prioritized for the "industry-leading" $2.80 per share dividend over non-dividend purposes for this cash. Once defendants Dow and Fitterling chose to use the January 2025 Earnings Call to speak about Dow's unique cash levers in

the context of the Company's "industry-leading dividend," they had a duty to speak completely and truthfully, including that Dow needed to prioritize this cash for non-dividend purposes in FY25.

209. On February 4, 2025, Dow filed the 2024 Form 10-K for FY24, which was signed by the Individual Defendants. The 2024 Form 10-K made a materially false and misleading statement about Dow's then-current ability to pay the $2.80 per share dividend, stating, in pertinent part, as follows:

> ***There are no significant restrictions limiting Dow Inc.'s ability to pay dividends.*** Dow Inc. declared dividends of $ 2.80 per share in 2024, 2023 and 2022.

210. The statement in ¶209 by Defendants about there being "no significant restrictions limiting Dow Inc.'s ability to pay dividends" was materially false and misleading for the reasons set forth in detail in ¶¶35-206 above, *i.e.*, Dow's need to prioritize the cash generated by the Company's unique cash levers for non-dividend purposes in FY25 meant there ***was*** a significant restriction on Dow's ability to pay the $2.80 per share dividend in FY25.

211. On March 13, 2025, defendant Tate participated at the March 2025 Conference. During the March 2025 Conference, an analyst with J.P. Morgan posed the following question about the sustainability of Dow's $2.80 per share dividend, to which Defendants responded unequivocally that the Company would fund the

$2.80 per share dividend "for the next several years" using Dow's unique cash levers, as follows:

> [Analyst]: So the thing about the Alberta [Path2Zero] project is you'll spend, I don't know, roughly -- with your regular CapEx, you'll spend, I don't know, $3 billion a year in CapEx. ***And you've got a couple of billion in dividend payments. And so that's a significant draw on cash flow.***
>
> And what you've done is you've got some NOVA [Litigation] proceeds, you'll have some Macquarie proceeds. ***Are there other steps or other levers that you might pull over the next several years? Or are we done***?
>
> [Tate]: ***We're never done, I would at least say that.*** We continue to look across our portfolio where there's wholly owned assets as well as looking across our joint ventures as well. And we've talked about consistently delivering, on average, $1 billion of unique to Dow cash flow levers, and that's the company that we'll continue to make.
>
> When you look at what we just discussed earlier in my prepared remarks between the NOVA [Litigation] judgment as well as the Macquarie impact, you're looking at probably $3.5 billion of cash tailwinds that we will deliver in 2025 alone.
>
> So to your earlier point, ***when you look at our CapEx, you look at our dividend, and I wanted to be crystal clear for us, and I mentioned this in my opening comments, our dividend is important to our owners and we recognize and appreciate that, and that dividend is very important to us as a management.***
>
> ***We remain committed to our dividend moving forward. And with these capital levers that I just highlighted, as well as our really solid balance sheet and where we stand from a liquidity perspective, we're in a really good position to be able to support our dividend for the next several years.***

212. The statement in ¶211 by defendants Dow and Tate about Dow being "never done" pulling cash levers to support the $2.80 per share dividend "over the next several years" was materially false and misleading for the reasons set forth in detail in ¶¶35-206 above, *i.e.*, because Dow was unable to continually pull unique cash levers to ensure that the $2.80 per share dividend was paid in FY25, let alone "over the next several years."

213. The statement in ¶211 by defendants Dow and Tate about Dow being "committed to our dividend moving forward" was materially false and misleading for the reasons set forth in detail in ¶¶35-206 above, *i.e.*, because Defendants were not committed to maintaining the $2.80 per share dividend in FY25, and instead needed to prioritize non-dividend purposes for the cash generated by the unique cash levers.

214. The statement in ¶211 by defendants Dow and Tate about Dow being "in a really good position to be able to support our dividend for the next several years" was materially false and misleading for the reasons set forth in detail in ¶¶35-206 above, *i.e.*, because Dow was not "in a really good position" to use the cash generated by the Company's unique cash levers to pay the $2.80 per share dividend in FY25, let alone "for the next several years."

215. On April 10, 2025, Defendants participated at the April 2025 Annual Meeting. Following the conclusion of the April 2025 Annual Meeting, defendant

Fitterling held a question-and-answer session with Dow's investors. The first question, raised by "several stockholders," was about "whether Dow can afford to sustain its dividend," which received a resoundingly positive "yes" from defendant Fitterling because of the Company's unique cash levers, as follow:

> [Amy Wilson, Dow General Counsel]: We'd like to start with a question that we received from several stockholders asking us ***whether Dow can afford to sustain its dividend.*** Jim?
>
> [Fitterling]: Thanks, Amy. With Dow's focus on operational and financial discipline, our strong balance sheet going into this economic situation ***and a unique to Dow cash levers that I have described earlier, they provided us the flexibility to navigate through this extended trough.*** In addition, through these persistent macroeconomic challenges, we are continuing to take a wide range of proactive actions to help ensure that we can support our capital allocation priorities with safely and reliably operating our plants ***and maintaining an industry leading dividend at the top of that list.***

216. The statements in ¶215 by defendants Dow and Fitterling about the Company's "unique to Dow cash levers" having "provided [Dow] the flexibility to navigate through this extended trough [in Dow's financial performance]" to "maintain[] an industry leading dividend [of $2.80 per share]" above all else ("at the top of that list") were materially false and misleading when made for the reasons set forth in ¶208.

217. On April 24, 2025, Defendants participated in the April 2025 Earnings Call. During the April 2025 Earnings Call, Defendants made materially false and

misleading statements regarding the Company's use of the unique cash levers to pay the $2.80 per share dividend in FY25 and beyond, as follows:

> [Analyst]: I was hoping you could expand a little bit more on how you're thinking of the security of the dividend in this environment. You have $4 billion of extra cash coming in this year, you're implementing some cost reductions. You've also reduced your spending for the year. ***Does that make the dividend secure for this year and probably next, and then after that, we'll have to see?*** Or are you thinking about it differently?
>
> [Fitterling]: Yeah. ***Attractive dividend yield is something that's always been a priority for Dow.*** We're well aware of the pressures that the current environment places on the capital structure, certainly, the $6 billion in the near term. ***And of that $6 billion, as Jeff mentioned earlier, the vast majority of that will come in in 2025. That will help support the dividend.*** But as the macro evolves, we'll have to continue to monitor and act in alignment with our capital allocation framework.

218. The statements made by defendants Dow and Fitterling in ¶217 that "[a]ttractive dividend yield is something that's always been a priority for Dow" and "the $6 billion in the near term . . . the vast majority of that will come in in 2025. That will help support the dividend [in FY25]" were materially false and misleading when made for the reasons set forth in ¶208.

219. On June 5, 2025, defendant Fitterling participated at the June 2025 Conference. During the June 2025 Conference, defendant Fitterling reiterated that the Company's ability to pay the $2.80 per share dividend in FY25 was intact because of the $6 billion generated by Dow's unique cash levers, as follows:

> So all total, our collective actions to navigate the realities of the current environment will deliver $6 billion in cash support over the next two

> years and enable Dow to maintain our financial flexibility. We do remain focused on delivering on our balanced capital allocation approach over the cycle while also positioning the company well to generate shareholder value.
>
> And as our industry weathers the current challenging conditions, ***we intend to pull all the levers we can to improve margins, support near term cash flow, and optimize our global portfolio. This includes the $6 billion in near term actions, cash support items that I just outlined.***
>
> * * *
>
> [Analyst]: On to dividend. Passing a comment to the Q1 call. I know it's a potential opening, some more perhaps flexibility on the dividend current conditions hold. Just again discuss your thinking on the dividends, if the current conditions do hold ***persist into next year***?
>
> [Fitterling]: Yeah, we have a healthy dividends. We came out of spend with a healthy dividend. We pay out in the neighborhood of $1.9 billion to $2 billion a year on dividends.
>
> It is not unusual at the bottom of the cycle for a dividend yield on a stock price basis to get to 9% plus. We've seen that before. The question is really how long is the cycle going to last? We've been the third year into it. There's views that it could be another year or two years.
>
> I don't know what that time frame is . . . ***So that's the reason we generated the $6 billion of interventions to say how can we make it through this year and next year and try to be secure in capital allocation.***

220. The statement in ¶219 by defendants Dow and Fitterling that "we intend to pull all the levers we can to . . . support near term cash flow" was materially false and misleading when made for the reasons set forth in ¶208.

221. The statement in ¶219 by defendants Dow and Fitterling that "we generated $6 billion of interventions to say how can we make it through this year and next year and try to be secure in [fully funding the $2.80 per share dividend]" was materially false and misleading for the reasons set forth in detail in ¶¶35-206 above, *i.e.*, because Dow did not generate $6 billion from the unique cash levers to fully fund the $2.80 per share dividend in FY25, but instead needed to prioritize this cash for non-dividend purposes.

## ADDITIONAL SCIENTER ALLEGATIONS

222. As alleged herein, Dow and the Individual Defendants acted with scienter in that they knew, or recklessly disregarded, that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew, or recklessly disregarded, that such statements or documents would be issued or disseminated to the investing public; and knowingly, or recklessly, and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.

223. As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of information reflecting the true facts regarding Dow, their control over, and/or receipt and/or modification of Dow's allegedly materially misleading statements and/or their associations with the Company which made them privy to

confidential proprietary information concerning Dow, participated in the fraudulent scheme alleged herein.

224. Defendants knew and/or recklessly disregarded the false and misleading nature of the information which they caused to be disseminated to the investing public. The fraudulent scheme described herein could not have been perpetrated during the Class Period without the knowledge and complicity or, at least, the reckless disregard of the personnel at the highest levels of the Company, including the Individual Defendants.

225. The Individual Defendants were each executive officers and/or directors of Dow during the Class Period. Based on their roles at Dow, each of the Individual Defendants would have been involved with, or knowledgeable about, the wrongdoing alleged herein, which centers on the source of funding for the Company's $2.80 per share annual dividend, the key component of Dow's Class Period investment thesis, as Defendants repeatedly emphasized during the Class Period. Thus, Company's $2.80 per share dividend and the related unique Dow cash levers (and Dow's FCF) constituted core operations of the Company during the Class Period, such that Defendants would have had knowledge of material information related to these topics during the Class Period.

226. At a minimum, Defendants failed to review or check information that they had a duty to monitor, or ignored obvious signs that their statements were

materially false and misleading or contained material omissions. Given the nature and extent of the problems at Dow, Defendants knew, or recklessly disregarded, the extent and scope of their statements during the Class Period.

227. The Individual Defendants, by virtue of their high-level positions with the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company and its business, operations, financial statements, and financial condition, as alleged herein. The Individual Defendants had the ultimate authority over and were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements regarding the Company were being issued, and approved or ratified these statements, in violation of the federal securities laws.

228. In addition, defendant Fitterling's admission that, at all relevant times, Defendants were focused on FCF and cash performance on a daily and weekly basis establishes that Defendants were constantly and carefully monitoring Dow's cash (both FCF and cash generated by the unique cash levers) during the Class Period.

229. Likewise, Ungerleider's admission that defendant Fitterling and Dow's CFO are ultimately responsible for the Company's cash flow confirms that

Defendants were fully apprised of Dow's cash (both FCF and cash generated by the unique cash levers) during the Class Period.

230. Moreover, the only Dow executives that had control over the use of the cash generated by the unique cash levers during the Class Period were the Individual Defendants. Because the decision to pull the unique cash levers to generate this non-operating cash was exclusively within the domain of the Individual Defendants and they unilaterally determined the usage of this cash, the Individual Defendants necessarily possessed actual knowledge of the true prioritization of use for this cash at all relevant times during the Class Period.

231. Further, Defendants' failure to provide ***any*** risk warnings to investors during the Class Period concerning Dow's ability to pay the $2.80 per share dividend or the use of the Company's unique cash levers as the source of that payment demonstrates that, at all relevant times, Defendants avoided addressing the risk that the $6 billion of non-operating cash needed to be prioritized for non-dividend purposes in FY25.

232. Also, the temporal proximity of Defendants' materially false and misleading statements and omissions with the revelation at the end of the Class Period that the cash generated by the unique cash levers needed to be prioritized for non-dividend purposes, thus necessitating a 50% reduction of the $2.80 per share dividend, further establishes Defendants' knowledge or reckless disregard. Indeed,

the closeness in time and magnitude of the deviation between Defendants' materially false and misleading statements and omissions made during the Class Period and the corrective information provided during the July 2025 Earnings Call further supports scienter.

233. Likewise, many of Defendants' materially false and misleading statements and omissions were made in response to specific questions by analysts regarding the priority of use for the cash generated by the unique cash levers during the Class Period. The specificity and repetition of these questions, and the fact that these questions centered on the most important aspect of Dow's operations during the Class Period – the sustainability of the $2.80 per share dividend – further contribute to a strong inference of scienter.

234. Moreover, Defendants possessed a powerful motive to convince investors that the Company's increasing dividend yield was indicative of a financially healthy company, not one in financial distress, notwithstanding Dow's protracted "downcycle" of financial performance in FY24 and FY25.

235. The allegations in this Complaint also establish a strong inference that Dow, as an entity, acted with corporate scienter throughout the Class Period because its officers, management, and agents had actual knowledge of the misrepresentations and omissions of material facts set forth herein (for which they had a duty to disclose), or acted with reckless disregard for the truth because they failed to

ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or with recklessness, and without a reasonable basis, for the purpose and effect of concealing Dow's true operating condition and present and expected financial performance from investors. By concealing these material facts from investors, Dow maintained and/or increased its artificially inflated common stock price throughout the Class Period.

236. As executive officers and/or directors of Dow, the Individual Defendants are both candidates for imputing corporate scienter to Dow.

237. In addition, as an executive or senior manager of Dow, Riker is also a candidate for imputing corporate scienter to Dow.

## LOSS CAUSATION/ECONOMIC LOSS

238. As detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of Dow's common stock and operated as a fraud or deceit on Class Period purchasers of the Company's common stock. When Defendants' prior misrepresentations and fraudulent conduct was disclosed and became apparent to the market, the trading price of Dow's common stock fell precipitously as the artificial inflation was removed.

239. As a result of their purchases of Dow common stock during the Class Period, Lead Plaintiff and the other Class members suffered economic loss, *i.e.*,

damages, under the federal securities laws. Defendants' false and misleading statements had the intended effect and caused the Company's common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $39.72 per share on February 18, 2025.

240. On July 24, 2025, before the open of the trading day, Defendants disclosed for the first time that Dow was cutting the $2.80 per share dividend by 50% because the Company was prioritizing the cash generated by Dow's unique cash levers for purposes other than paying the full $2.80 per share dividend in FY25, as Defendants had previously and repeatedly guaranteed.

241. In response to this revelation, the price of Dow common stock declined from a closing price of $30.37 per share before the announcement on July 23, 2025, to a closing price of $25.07 per share on July 24, a decline of $5.30, or 17.45%.

242. As shown above, the timing and magnitude of the price decline in Dow's common stock negate any inference that the losses suffered by Lead Plaintiff and the Class were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraud.

## CLASS ACTION ALLEGATIONS

243. Lead Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of the common stock of Dow during the Class Period, inclusive, and who

were damaged thereby (the "Proposed Class"). Excluded from the Proposed Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

244. The members of the Proposed Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Dow common stock was actively traded on the NYSE. While the exact number of Proposed Class members is unknown to Lead Plaintiff at this time and can only be ascertained through appropriate discovery, Lead Plaintiff believes that there are hundreds, if not thousands, of members in the Proposed Class. Record owners and other members of the Proposed Class may be identified from records maintained by Dow and/or its transfer agent and may be notified of the pendency of this action by mail or by electronic mail, using the form of notice similar to that customarily used in securities class actions.

245. Lead Plaintiff's claims are typical of the claims of the members of the Proposed Class as all members of the Proposed Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

246. Lead Plaintiff will fairly and adequately protect the interests of the members of the Proposed Class and has retained counsel competent and experienced in class and securities litigation.

247. Common questions of law and fact exist as to all members of the Proposed Class and predominate over any questions solely affecting individual members of the Proposed Class. Among the questions of law and fact common to the Proposed Class are:

(a) whether statements made by Defendants misrepresented material facts about the business, operations, and management of Dow;

(b) whether Defendants failed to disclose material facts in discussing the business, operations, and management of Dow, making those statements materially false and misleading;

(c) whether the federal securities laws were violated by Defendants' acts or omissions as alleged herein;

(d) whether the price of Dow common stock was artificially inflated during the Class Period; and

(e) to what extent the members of the Proposed Class have sustained damages and the proper measure of damages.

248. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is

impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Proposed Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## NO SAFE HARBOR

249. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the false statements challenged herein. Many of the statements challenged herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, no meaningful cautionary statements identified important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of the Company who knew that those statements were false when made.

## APPLICATION OF PRESUMPTION OF RELIANCE: THE *BASIC* AND *AFFILIATED UTE* PRESUMPTIONS

250. Lead Plaintiff will rely upon the presumption of reliance established by the fraud on the market doctrine as outlined in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988) ("*Basic*"), and/or the presumption of reliance for omissions as outlined in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972) ("*Affiliated Ute*").

251. With respect to the *Basic* presumption, a presumption of reliance under the fraud on the market doctrine is appropriate because, among other things:

(a) Defendants made public misrepresentations and failed to disclose material facts during the Class Period;

(b) the misrepresentations and omissions were material;

(c) the Company's common stock traded in an efficient market;

(d) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's stock; and

(e) Lead Plaintiff and other members of the Proposed Class purchased Dow common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

252. At all relevant times, the market for Dow common stock was efficient for the following reasons, among others:

(a) Dow common stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient, electronic stock market;

(b) as a regulated issuer, Dow filed periodic public reports with the SEC and the NYSE;

(c) Dow regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d) Dow was followed by numerous securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

253. As a result of the foregoing, the market for Dow common stock promptly digested current information regarding Dow from all publicly available sources and reflected such information in the price of the stock. Under these circumstances, all purchasers of Dow common stock during the Class Period suffered similar injury through their purchase of Dow common stock at artificially inflated prices and a presumption of reliance applies.

254. In addition to the *Basic* presumption, a class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute*. Because this action involves Defendants' failure to disclose material adverse information regarding Dow's central business operations – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5 Against All Defendants

255. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

256. During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and/or failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

257. Defendants: (1) employed devices, schemes, and artifices to defraud; (2) made untrue statements of material fact and/or omitted to state material facts

necessary to make the statements not misleading; and (3) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Dow common stock during the Class Period.

258. Lead Plaintiff and the Proposed Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Dow common stock. Lead Plaintiff and the Proposed Class would not have purchased Dow common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements and/or omissions.

259. As a direct and proximate result of Defendants' wrongful conduct, Lead Plaintiff and the other members of the Proposed Class suffered damages in connection with their purchases of Dow common stock during the Class Period.

## COUNT II

### For Violations of §20(a) of the Exchange Act Against the Individual Defendants

260. Lead Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

261. The Individual Defendants acted as controlling persons of Dow within the meaning of Section 20(a) of the Exchange Act as alleged herein. By reason of their positions as executive officers and/or directors of Dow, the Individual Defendants had the power and authority to cause Dow to engage in the wrongful

conduct complained of herein. By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff prays for relief and judgment against Defendants, as follows:

A. Determining that this action is a proper class action, certifying Lead Plaintiff as a Class Representatives under Rule 23 of the Federal Rules of Civil Procedure, and appointing Robbins Geller Rudman & Dowd LLP as Class Counsel;

B. Awarding compensatory damages in favor of Lead Plaintiff and the Proposed Class against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Proposed Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Awarding Lead Plaintiff and the Proposed Class such other and further relief as may be just and proper under the circumstances.

## JURY DEMAND

Lead Plaintiff hereby demands a trial by jury.

DATED: March 31, 2026

Respectfully submitted,

ROBBINS GELLER RUDMAN
& DOWD LLP
SAMUEL H. RUDMAN
MICHAEL G. CAPECI
MAGDALENE ECONOMOU

*/s/ Michael G. Capeci*
MICHAEL G. CAPECI

58 South Service Road, Suite 200
Melville, NY 11747
Telephone: 631/367-7100
631/367-1173 (fax)
*srudman@rgrdlaw.com*
*mcapeci@rgrdlaw.com*
*meconomou@rgrdlaw.com*

*Lead Counsel for Lead Plaintiff*

VANOVERBEKE, MICHAUD
& TIMMONY, P.C.
THOMAS C. MICHAUD (P46787)
79 Alfred Street
Detroit, MI 48201
Telephone: 313/578-1200
*tmichaud@vmtlaw.com*

*Local Counsel*