**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| CURTIS LIN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DOW INC., JIM FITTERLING, and JEFFREY L. TATE,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 1:25-cv-12744-JEL-PTM<br><br>CLASS ACTION<br><br>Honorable Judith E. Levy<br>District Judge<br><br>Honorable Patricia T. Morris<br>Magistrate Judge |

**DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

For the reasons set forth in the accompanying brief, and the Declaration of Jonathan E. Lauderbach in Support of Defendants' Motion to Dismiss and its accompanying exhibits, Defendants Dow Inc., Jim Fitterling, and Jeffrey L. Tate respectfully request that Plaintiff's Amended Class Action Complaint for Violations of the Federal Securities Laws be dismissed with prejudice pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-4, for failure to state claims upon which relief can be granted.

Briefing of this motion was discussed between the parties and stipulated to as reflected in the Court's endorsement at ECF No. 36.

Dated: June 22, 2026

Respectfully submitted,

*/s/ Jonathan E. Lauderbach*

Jonathan E. Lauderbach (P51313)
WARNER NORCOSS + JUDD LLP
715 East Main Street, Suite 110
Midland, MI 48640
Telephone: 989/698-3701
jlauderbach@wnj.com

Lyle Roberts
ALLEN OVERY SHEARMAN
STERLING US LLP
1101 New York Ave., NW
Washington, D.C. 20005
Telephone: 202/508-8108
lyle.roberts@aoshearman.com

Mallory Tosch Hoggatt
ALLEN OVERY SHEARMAN
STERLING US LLP
800 Capitol Street, Suite 2200
Houston, TX 77002
Telephone: 713/354-4800
mallory.toschhoggatt@aoshearman.com

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on June 22, 2026

*/s/ Jonathan E. Lauderbach*

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| CURTIS LIN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>DOW INC., JIM FITTERLING, and JEFFREY L. TATE,<br><br>Defendants. | ) | No. 1:25-cv-12744-JEL-PTM<br><br>CLASS ACTION<br><br>Honorable Judith E. Levy<br>District Judge<br><br>Honorable Patricia T. Morris<br>Magistrate Judge |

**BRIEF IN SUPPORT OF THE DEFENDANTS' MOTION TO DISMISS THE AMENDED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

STATEMENT OF ISSUES PRESENTED ........ viii

CONTROLLING OR MOST APPROPRIATE AUTHORITIES ........ ix

I. INTRODUCTION ........ 1

II. BACKGROUND ........ 4

A. OVERVIEW OF DOW AND ITS HISTORICAL DIVIDEND ........ 4

B. IMPACT OF GLOBAL MACROECONOMIC TRENDS ON DOW'S CASH FLOWS AND DIVIDEND IN Q1 2025 ........ 6

C. CONTINUED MARKET CHALLENGES IN Q2 2025 AND DOW'S DECISION TO LOWER ITS DIVIDEND ........ 11

D. RELEVANT PROCEDURAL HISTORY ........ 13

III. LEGAL STANDARD ........ 13

IV. ARGUMENT ........ 17

A. PLAINTIFF FAILS TO PLEAD ANY ACTIONABLE MISSTATEMENT ........ 18

1. Management Statements About Commitment to Paying a Dividend are Immaterial as a Matter of Law ........ 19

2. Dow Disclosed the Factors That Impacted Its Ability to Pay a Dividend, Making the Alleged Misstatements Inactionable ........ 24

3. All of the Alleged Misstatements Were Made Before the June 13, 2025 Dividend Payment ........ 26

4. Certain Forward-Looking Statements Are Inactionable Pursuant to the PSLRA's "Safe Harbor" ........ 27

B. PLAINTIFF FAILS TO PLEAD ANY FACTS GIVING RISE TO AN INFERENCE OF SCIENTER ........ 28

1. No *Helwig* Factor Supports An Inference of Scienter ........ 30

2. When Viewed Holistically, Plaintiff's Scienter Allegations Fail to Create a Cogent or Compelling Inference of Scienter ........ 34

C. THE SECTION 20(a) CLAIM FAILS ............................................... 35
V. CONCLUSION ........................................................................................ 35

# TABLE OF AUTHORITIES

**PAGE(S)**

**CASES**

*In re Anheuser-Busch InBev SA/NV Sec. Litig.*,
2020 WL 5819558 (S.D.N.Y. Sep. 29, 2020) ....................16

*Byrd v. ViSalus, Inc.*,
2018 WL 1637948 (E.D. Mich. Apr. 5, 2018) ....................25

*In re Cardinal Health Inc. Sec. Litigs.*,
426 F. Supp. 2d 688 (S.D. Ohio 2006) ....................17

*In re Champion Enters., Inc., Sec. Litig.*,
145 F. Supp. 2d 871 (E.D. Mich. 2001) ....................35

*City of Plantation Police Officers Pension Fund v. Meredith Corp.*,
16 F.4th 553 (8th Cir. 2021) ....................22

*City of Pontiac Emps.' Ret. Sys. v. Stryker Corp.*,
865 F. Supp. 2d 811 (W.D. Mich. 2012) ....................27

*In re Comshare, Inc. Sec. Litig.*,
183 F.3d 542 (6th Cir. 1999) ....................14, 15, 28

*In re Diebold Sec. Litig.*,
2008 WL 3927467 (N.D. Ohio Aug. 22, 2008) ....................32

*Doshi v. Gen. Cable Corp.*,
386 F. Supp. 3d 815 (E.D. Ky. 2019) ....................31

*Doshi v. Gen. Cable Corp.*,
823 F.3d 1032 (6th Cir. 2016) ....................15, 30, 35

*Dura Pharms., Inc. v. Broudo*,
544 U.S. 336 (2005) ....................4

*In re Dynagas LNG Partners LP Sec. Litig.*,
504 F. Supp. 3d 289 (S.D.N.Y. 2020) ....................16, 23

*Ernst & Ernst v. Hochfelder*,
425 U.S. 185 (1976) ....................15

*In re EveryWare Glob., Inc. Sec. Litig.*,
175 F. Supp. 3d 837 (S.D. Ohio 2016) ....................31

*In re General Electric Co. Sec. Litig.*,
857 F. Supp. 2d 367 (S.D.N.Y. 2012) ....................23

*Graff v. Prime Retail, Inc.*,
172 F. Supp. 2d 721 (D. Md. 2001) ....................23

*Helwig v. Vencor, Inc.*,
251 F.3d 540 (6th Cir. 2001) ....................15, 30

*Ind. State Dist. Council of Laborers v. Omnicare, Inc.*,
583 F.3d 935 (6th Cir. 2009) ....................13, 14

*In re Int'l Bus. Machs. Corp. Sec. Litig.*,
163 F.3d 102 (2d Cir. 1998) ....................20, 26

*Jawad v. Hudson City Sav. Bank, FSB*,
2014 WL 7272342 (E.D. Mich. Dec. 18, 2014) ....................17

*In re Keithley Instruments Inc. Sec. Litig.*
268 F. Supp. 2d 887 (N.D. Ohio 2002) ....................28

*In re Kindred Healthcare, Inc. Sec. Litig.*,
299 F. Supp. 2d 724 (W.D. Ky. 2004) ....................27

*Knurr v. Orbital ATK, Inc.*,
272 F. Supp. 3d 784 (E.D. Va. 2017) ....................33

*Konkol v. Diebold, Inc.*,
590 F.3d 390 (6th Cir. 2009) ....................31, 32

*La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*,
622 F.3d 471 (6th Cir. 2010) ....................15, 29

*Lubbers v. Flagstar Bancorp. Inc.*,
162 F. Supp. 3d 571 (E.D. Mich. 2016) ....................16

*Maeve Inv. Co. Ltd. P'ship v. Teekay Corp.*,
2017 WL 5158059 (W.D. Wash. Nov. 7, 2017) ....................16, 23

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*,
547 U.S. 71 (2006)....................16

*Merzin v. Provident Fin. Grp., Inc.*,
311 F. Supp. 2d 674 (S.D. Ohio 2004)....................17

*Miller v. Gen. Motors, LLC*,
773 F. Supp. 3d 461 (E.D. Mich. 2025)....................22

*NetJets Aviation, Inc. v. Perlman*,
2024 WL 4290258 (S.D. Ohio Sept. 25, 2024)....................22

*Norfolk Cnty. Ret. Sys. v. Tempur-Pedic Int'l, Inc.*,
22 F. Supp. 3d 669 (E.D. Ky. 2014)....................17

*In re NVE Corp. Sec. Litig.*,
551 F. Supp. 2d 871 (D. Minn. 2007)....................33

*In re Omnicare, Inc. Sec. Litig.*,
769 F.3d 455 (6th Cir. 2014)....................16, 35

*In re Overstock Sec. Litig.*,
2021 WL 4267920 (D. Utah Sept. 20, 2021)....................28

*Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*,
614 F. App'x 237 (6th Cir. 2015)....................27

*Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.*,
940 F. Supp. 1101 (W.D. Mich. 1996)....................35

*Pittman v. Unum Grp.*,
861 F. App'x 51 (6th Cir. 2021)....................33

*PR Diamonds, Inc. v. Chandler*,
364 F.3d 671 (6th Cir. 2004)....................13, 31, 34

*In re Seadrill Ltd. Sec. Litig.*,
2016 WL 3461311 (S.D.N.Y. June 20, 2016)....................23, 26

*SLF H'ldgs, LLC v. Uniti Fiber H'ldgs, Inc.*,
499 F. Supp. 3d 49 (D. Del. 2020)....................23, 24

*Stein v. U.S. Xpress Enters., Inc.*,
2020 WL 3584800 (E.D. Tenn. June 30, 2020) ....................................................32

*Stoneridge Inv. Partners, LLC v. Sci.–Atlanta*,
552 U.S. 148 (2008)....................................................................................................14

*Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. H'ldgs, Inc.*,
83 F.4th 514 (6th Cir. 2023) ......................................................................................25

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)..................................................................................15, 16, 17, 29

*In re United Am. Healthcare Corp. Sec. Litig.*,
2007 WL 313491 (E.D. Mich. Jan. 30, 2007) ..........................................................22

*Vaccaro v. New Source Energy Partners L.P.*,
2016 WL 7373799 (S.D.N.Y. Dec. 19, 2016) ......................................................24, 25

*Walker v. L Brands, Inc.*,
2020 WL 6118467 (S.D. Ohio Oct. 16, 2020) ..................................16, 20, 21, 24

*Zaluski v. United Am. Healthcare Corp.*,
527 F.3d 564 (6th Cir. 2008) ......................................................................................13

**STATUTES & RULES**

15 U.S.C. § 78j(b) ..........................................................................................................13

15 U.S.C. § 78t(a) ..........................................................................................................13

15 U.S.C. § 78u-4(b)(1) .................................................................................................14

15 U.S.C. § 78u-4(b)(2) .................................................................................................14

15 U.S.C. § 78u-4(b)(3) .................................................................................................14

15 U.S.C. § 78u-5(c)(1) .................................................................................................27

Fed. R. Civ. P. 9(b) ........................................................................................................14

**OTHER AUTHORITIES**

Edward Flores et al., Recent Trends in Securities Class Action Litigation: 2025 Full-Year Review (Jan. 21, 2026), https://www.nera.com/insights/publications/2026/recent-trends-in-securities-class-action-litigation--2025-full-y.html ........................................... 16

# STATEMENT OF ISSUES PRESENTED

1) Should the Amended Complaint for securities fraud be dismissed because Plaintiff fails to identify any actionable misstatement or omission?

   *Defendants' answer: Yes*

2) Should the Amended Complaint for securities fraud be dismissed because Plaintiff fails to adequately plead scienter as to any of the Defendants?

   *Defendants' answer: Yes*

3) Should the Amended Complaint for securities fraud be dismissed to the extent Plaintiff premises its claim on "scheme" liability because Plaintiff fails to adequately plead a separate scheme?

   *Defendants' answer: Yes*

4) Should the Amended Complaint's claim for control person liability claim be dismissed because Plaintiff does not adequately plead a primary violation of the securities laws?

   *Defendants' answer: Yes*

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

15 U.S.C. §§ 78u-4(b)(1) through (3)

15 U.S.C. § 78u-5(c)(1)

Fed. R. Civ. P. 9(b)

*In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542 (6th Cir. 1999)

*In re Champion Enters., Inc., Sec. Litig.*, 145 F. Supp. 2d 871 (E.D. Mich. 2001)

*Doshi v. Gen. Cable Corp.*, 823 F.3d 1032 (6th Cir. 2016)

*Doshi v. Gen. Cable Corp.*, 386 F. Supp. 3d 815 (E.D. Ky. 2019)

*Ind. State Dist. Council of Laborers v. Omnicare, Inc.*, 583 F.3d 935 (6th Cir. 2009)

*Helwig v. Vencor, Inc.*, 251 F.3d 540 (6th Cir. 2001)

*In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998)

*In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455 (6th Cir. 2014)

*PR Diamonds, Inc. v. Chandler*, 364 F.3d 671 (6th Cir. 2004)

*La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471 (6th Cir. 2010)

*Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*, 614 F. App'x 237 (6th Cir. 2015)

*SLF H'ldgs, LLC v. Uniti Fiber H'ldgs, Inc.*, 499 F. Supp. 3d 49 (D. Del. 2020)

*Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. H'ldgs, Inc.*, 83 F.4th 514 (6th Cir. 2023)

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)

*Vaccaro v. New Source Energy Partners L.P.*, 2016 WL 7373799 (S.D.N.Y. Dec. 19, 2016)

*Walker v. L Brands, Inc.*, 2020 WL 6118467 (S.D. Ohio Oct. 16, 2020)

# I. INTRODUCTION

Plaintiff has brought a securities fraud case that is meritless on its face. Plaintiff asserts that in the first half of 2025, Dow's management "guaranteed" the payment of the Company's dividend at $0.70 per share every quarter, but then in July 2025 announced that the dividend would be reduced. But the public record makes it clear that Defendants' statements about the dividend nowhere used the word "guarantee" or its equivalent. Moreover, whether Dow would pay a dividend was a quarter-to-quarter decision made by the Company's Board of Directors (not management). The market understood that the Board could reduce the dividend and analysts expressed no surprise when it did so. Under these circumstances, Plaintiff does not, and cannot, satisfy the heightened pleading standards for securities fraud claims under the Private Securities Litigation Reform Act of 1995 ("PSLRA"). Plaintiff's case should be dismissed with prejudice.

Dow is one of the world's leading materials science companies and has its principal offices in Midland, Michigan. The Company relies on the cash generated by its operations, as well as other sources, to fund its capital expenditures, repay its debt, and make its dividend payments to shareholders. From April 2019 to June 2025, Dow consistently paid a quarterly dividend amounting to $0.70 per share. However, these dividend payments were made at the discretion of the Dow's Board of Directors and were subject to change on a quarter-by-quarter basis.

In 2023 and 2024, Dow faced declining free cash flow (i.e., the cash the Company generated after covering its operating expenses and capital expenditures). Nevertheless, as of early 2025, Dow continued to believe that it had sufficient "cash levers" that it could use to generate the cash necessary to cover its 2025 dividend payments. In the second quarter of 2025 (April 1 to June 30—"Q2 2025"), however, it became apparent that the economic headwinds Dow was facing were not abating and its business showed no signs of near-term recovery. As a result, continuing to pay the dividend at the same level was putting financial strain on the Company. Dow's Board decided to reduce the quarterly dividend to $0.35 per share and disclosed that decision to investors on July 24, 2025. That measured reduction preserved a continuing dividend while addressing the financial strain created by the ongoing market and industry conditions.

Shortly thereafter, Plaintiff brought a securities class action alleging that Defendants fraudulently "guaranteed," starting in January 2025, that it would ensure that the cash it generated in fiscal year 2025 ("FY 2025") would be used to pay its dividend in the exact same amount no matter what happened to its business or the declining fundamentals in the chemical industry. But the Amended Complaint ("AC" or "Complaint"), ECF No. 31, fails to identify any public statement made by the Defendants where the word "guarantee"—or any equivalent word—is used in

connection with Dow's dividend, much less a promise that the dividend would not change one penny from its historic level.

To the contrary, Dow diligently informed investors that it was facing economic headwinds and severe industry-wide pressures that were negatively impacting its cash position and that changes to its dividend payment could happen. And, indeed, market analysts reported that Dow did not have a "firm commitment" to its historical dividend payment, that the dividend payment was a "quarterly decision" that the Company was considering, and then, as Q2 2025 progressed, that it was "a matter of when and by how much the dividend is cut, not if." Once the dividend reduction was announced, market observers expressed no surprise.

Given that Plaintiff's theory of fraud is belied by the documents relied upon in the Complaint and the facts properly before the Court, it follows that their claims also completely fail to meet the PSLRA's heightened pleading standards for securities fraud. First, Plaintiff does not provide any particularized facts demonstrating that Dow's statements concerning its dividend were false and misleading. Second, Plaintiff does not, because he cannot, plead a strong inference of scienter (i.e., fraudulent intent) as to any of the Defendants.

In particular, the crux of Plaintiff's scienter theory is that Dow *knew* that it would be reducing its dividend prior to receiving its Q2 2025 financial results. But Plaintiff does not plead any facts suggesting that this decision was made before the

end of Q2 2025 or, alternatively, that Defendants knew or were severely reckless in not knowing that the Company would reduce its dividend in 2025 before it did so.

Securities fraud claims do not exist "to provide investors with broad insurance against market losses." *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 345 (2005). If a successful case could be brought every time a company made an announcement that led to a stock price decline, the courts would be awash in securities litigation. Indeed, this is exactly the type of baseless and hindsight securities fraud claim that Congress sought to prevent when it passed the PSLRA. Defendants respectfully request that the Court dismiss Plaintiff's claims with prejudice.

## II. BACKGROUND

### A. OVERVIEW OF DOW AND ITS HISTORICAL DIVIDEND

Dow Inc. is the holding company for The Dow Chemical Company, a company that was originally organized in Michigan in 1897, and which maintains its principal offices in Midland, Michigan. AC ¶¶ 24, 37–38. Dow, now organized under the laws of Delaware, is one of the world's leading materials science companies, serving customers in high-growth, cyclical markets such as packaging, infrastructure, mobility, and consumer applications. *Id.* ¶¶ 24, 35. Dow specifically operates chemical manufacturing sites in 30 countries and had sales in the fiscal year ended December 31, 2024, of approximately $43 billion. *Id.* ¶ 36. Mr. Fitterling is Dow's CEO and Mr. Tate is its CFO. *Id.* ¶¶ 25–26.

Dow stock has been trading on the New York Stock Exchange pursuant to its current corporate structure since April 2019. *Id.* ¶¶ 40–44. From April 2019 through June 2025, Dow paid a quarterly dividend of $0.70 per share ($2.80 per share annually). AC ¶¶ 47–49; Ex. 2 at 51.[1] Importantly, however, Dow has never guaranteed its investors that it either would pay dividends or would pay them out at a certain amount. Instead, the Company told the market that it "expects to continue to do so, subject to approval by the Dow Inc. Board of Directors." Ex. 1 at 31, 47.

Dow always has been transparent with investors that it pays its dividends based on its cash flows. For example, Dow explained in its 2024 Form 10-K that "[t]he Company's primary source of incremental liquidity is cash flows from operating activities" and that "[t]he generation of cash from operations . . . is expected to meet the Company's cash requirements for . . . dividend distributions to stockholders[.]" Ex. 1 at 44. And Dow's cash flows, like those of many chemical companies, are susceptible to business interruptions and challenges posed by the chemical industry's cyclical conditions of peaks and troughs.

Accordingly, Dow expressly cautioned investors about how business conditions can impact its operations and liquidity, and, necessarily, its cash flows and dividend. These cautions included noting in its 2024 Form 10-K that "[m]arket conditions could reduce the Company's flexibility to respond to changing business

[1] The exhibits accompany the declaration of Jonathan E. Lauderbach.

conditions or fund capital needs" and that "higher input costs and margin compression have reduced demand for the Company's products, resulting in decreased sales volume in recent years which has yet to fully recover." *Id.* at 21–22. Moreover, as the Complaint makes clear, Dow's investors understood in December 2024 that these business conditions—which resulted in Dow having negative free cash flow in FY 2024—would have an impact on the Company's ability to pay its dividend at the current rate if they continued into FY 2025. *See* AC ¶¶ 118 ("investor concerns around the free cash flow bridge / Dow's ability to fund the dividend through the ongoing cyclical trough"); 119 (describing "concerns around the stability of the dividend"); 120 (noting "increased questions over Dow's cash flow statement in recent months, and, in particular, following Celanese's November 4, 2024 divided cut (i.e., Dow shares down 12.5% since then and ~25% since October)").

### B. IMPACT OF GLOBAL MACROECONOMIC TRENDS ON DOW'S CASH FLOWS AND DIVIDEND IN Q1 2025

As it turned out, Dow's business continued to be negatively impacted by global macroeconomic and chemical-industry trends in the first half of 2025. *E.g.*, AC ¶ 195. Although Dow remained optimistic about its ability to maintain its dividend at an "industry leading" level, including by using various cash levers to generate the necessary cash to fund the dividend, it also repeatedly cautioned investors that the Company was facing significant macroeconomic and business

headwinds of the type it previously had disclosed were negatively affecting its cash flow. *See, e.g.*, Ex. 3 at 4, 6, 8; Ex. 4 at 5; Ex. 6 at 3. In other words, Dow provided the exact risk disclosures that Plaintiff incorrectly asserts were missing from the Company's public disclosures (*see* AC ¶¶ 15, 189–90). And far from believing that Dow had "guaranteed" its dividend, market analysts understood that these business conditions could lead to a dividend reduction (as they already had for peers in the chemical industry like Celanese, *see* AC ¶ 120).

Plaintiff asserts that Dow made a total of six sets of misstatements concerning its dividend during the first half of 2025, all of which are alleged to have been false "guarantees" that the Company would ensure that the cash it generated in FY 2025 would be used to pay its dividend in the exact same amount no matter what happened to its business or the declining fundamentals in the chemical industry. AC ¶¶ 11, 13–14, 155, 160, 170, 188, 190, 207–08, 240. In context, it is abundantly clear that no such "guarantee" was ever made.

Plaintiff alleges that during a January 30, 2025 conference call discussing earnings for the final quarter of 2024, Mr. Fitterling misleadingly noted that Dow was "confident in our ability to deliver on all of our capital allocation priorities, including our industry-leading dividend" and emphasized that "keeping our dividend strong is one of the number one priorities." AC ¶¶ 131, 207. But Mr. Tate also expressed on the call that the company was facing "[o]ngoing affordability

challenges" and Mr. Fitterling noted Dow was "navigat[ing] a challenging near-term environment" with "weak global macroeconomic conditions." Ex. 3 at 4, 6, 8.

Plaintiff next alleges that the Company, in its 2024 Annual Report published on February 4, 2025, misleadingly noted "[t]here are no significant restrictions limiting Dow Inc.'s ability to pay dividends." AC ¶¶ 187, 209. Not only is an "ability to pay" not the same thing as "will pay at a certain level," but Plaintiff ignores the report's extensive risk disclosures addressing how business conditions "could reduce the Company's flexibility to . . . fund capital needs" (e.g., the dividend). *See* Ex. 1 at 21–22.

Plaintiff then alleges that at a J.P. Morgan conference on March 13, 2025, Mr. Tate misleadingly emphasized that the company would consistently look for ways to generate cash flow, and that the company was "committed to our dividend moving forward" and believed it was "in a really good position to be able to support our dividend for the next several years." AC ¶¶ 144, 211. But Mr. Tate also stated at the conference that "[f]rom a macroeconomic perspective, demand remains soft" and that "economic deceleration that began in the second half of last year across most regions as well as end markets is persisting into the first quarter with no signs of inflection." Ex. 4 at 5. Mr. Tate concluded that the company was "navigat[ing] a challenging macroeconomic environment." *Id.* Analysts understood that these developments could negatively impact Dow's dividend. Indeed, on April 4, 2025,

J.P. Morgan lowered its rating on Dow "from Overweight to Neutral given higher economic risks" and noted that while it expected Dow to pay its dividend in 2025, the company's operating cash flows "do not entirely cover capex and dividends, making investors uneasy." Ex. 5 at 1.

At the company's annual shareholder meeting on April 10, 2025, Plaintiff alleges that Mr. Fitterling misleadingly responded to a question about its dividend by noting that the company has "cash levers that . . . provided us the flexibility to navigate through this extended trough" and the company aimed to "maintain[] an industry leading dividend." AC ¶¶ 149, 215. But Mr. Fitterling also commented that the Company was working "through this challenging macroeconomic environment" and faced "persistent macroeconomic challenges." Ex. 6 at 3. Again, the market understood that these developments and comments meant that Dow's dividend was at risk and that it was far from guaranteed at the current level, with Deutsche Bank commenting on April 20, 2025 that "[r]isks to the short-term investment idea [for Dow] include . . . *the lack of a firm commitment* to its dividend." Ex. 8 at 1 (emphasis added).

Also on April 10, 2025, Dow announced—consistent with the supposedly misleading statements discussed above—that it would continue to pay a quarterly dividend of $0.70 per share, and filed that disclosure with the SEC on April 15, 2025. AC ¶ 150; Ex. 7 at 5. Plaintiff alleges that Mr. Fitterling misleadingly noted in

response to a question about the company's dividend during a conference call held April 24, 2025, that an "[a]ttractive dividend yield is something that's always been a priority for Dow. We're well aware of the pressures that the current environment places on the capital structure, certainly, the $6 billion in the near term. And of that $6 billion, as Jeff mentioned earlier, the vast majority of that will come in in 2025. That will help support the dividend." AC ¶¶ 154, 217. But Plaintiff ignores what Mr. Fitterling said next: "But as the macro evolves, we'll have to continue to monitor and act in alignment with our capital allocation framework." Ex. 9 at 15. And at other times during the call, Mr. Fitterling also cautioned that "[t]he reality is our industry has been one of the most protracted down cycles in decades," "global demand remains well below historical average GDP levels," and that, with respect to a key product offering, "we expect the challenging macro to continue." *Id.* at 5, 7, 14.

Immediately after the April 24 earnings call, Morningstar reported that "the dividend could be at risk if profits continue to fall" (Ex. 10 at 2) and Wells Fargo similarly noted that the dividend was supportable "unless market pressures worsen" (Ex. 11 at 3). And several weeks later, on June 3, 2025, UBS reported that "DOW notes that *the dividend is a quarterly decision* and it is *an ongoing evaluation of the best use of capital*." Ex. 12 at 2 (emphasis added).

### C. CONTINUED MARKET CHALLENGES IN Q2 2025 AND DOW'S DECISION TO LOWER ITS DIVIDEND

The only statement that Plaintiff alleges is misleading following the Company's announcement of its $0.70 quarterly dividend in April 2025 was made at a conference held on June 5, 2025. In response to a specific question about the dividend, Mr. Fitterling noted the efforts Dow was employing to support the company's cash flows, so that the Company could be "secure in capital allocation." AC ¶¶ 161, 219. But Plaintiff conveniently ignores that Mr. Fitterling also said that Dow was "looking forward structurally with some of the changes that have happened," and was asking, in light of the deteriorating economic conditions, "*how long can you support [the dividend]*? And will there be pressure that becomes overwhelming to take a different look?" Ex. 13 at 10 (emphasis added). On June 13, 2025, Dow paid its quarterly dividend of $0.70 per share. Ex. 2 at 51.

Unsurprisingly, following Mr. Fitterling's remarks in early June, analysts began to report that a Dow dividend reduction was inevitable. Deutsche Bank stated on June 19, 2025 that "we believe a dividend cut is largely expected by the market and wanted by the majority of investors." Ex. 14 at 2. Similarly, on June 23, 2025, BMO Capital Markets concluded that "there appears a heightened risk DOW may cut the dividend," Ex. 15 at 1, and then on July 1, 2025 Evercore reported that "the prospect of a DOW dividend cut [is] now openly acknowledged by the company[.]" Ex. 16 at 1. The next day, in an analyst report entitled "*Dow, Lowering Q2 and '25*

*Estimates. Dividend Cut Likely,*" Deutsche Bank declared its belief that "it is a matter of when and by how much the dividend is cut, not if." Ex. 17 at 2.

Consistent with these market expectations, on July 24, 2025, Dow announced that its Board had decided to reduce its quarterly dividend from $0.70 per share to $0.35 per share. AC ¶¶ 193–95.[2] In doing so, Mr. Fitterling highlighted "the earnings pressure the industry downturn has created" and emphasized that "the reduction in the dividend was to keep our cash flexibility through the bottom of the cycle" while "maintaining [Dow's] credit rating." Ex. 18 at 9, 15.

Dow's market analysts "were not surprised to see Dow cut the dividend," Ex. 20 at 1, 6 (Morningstar). Indeed, analysts noted that the "reduced dividend was not unexpected," Ex. 21 at 1 (RBC Capital Markets), and the "[d]ividend cut was expected (and desired)," Ex. 22 at 1 (Morgan Stanley). To the extent market observers expressed any surprise, it was that Dow did not reduce its dividend *even more*. Deutsche Bank wrote in a report entitled "*Dow, Dividend Cut by 50%. Is it Enough?*" that "[i]n a widely anticipated move, Dow reduced its nearly $2B annual

[2] "'Dividend yield' is calculated by dividing the current annual dividend for a common stock by the current price per share." AC ¶ 59. Before the dividend reduction, Dow's dividend yield ranged from as high as 12.7% to as low as 3.9%. AC ¶¶ 62–63. Following the reduction announced in July 2025, Dow's dividend yield was about 5.6%, which was "in line with the Company's [historical] dividend yield." AC ¶ 198. In other words, consistent with Plaintiff's own allegations, the dividend reduction maintained Dow's dividend within its historical yield range.

dividend by 50% (from $2.80/share to $1.40/share)" and opined that "we do not believe the dividend cut will be viewed as enough by most investors." Ex. 19 at 1.

### D. RELEVANT PROCEDURAL HISTORY

Todd Sarti initially commenced this suit on August 29, 2025. ECF No. 1. Following the lead plaintiff appointment process mandated by the PSLRA, Curtis Lin was appointed Lead Plaintiff. Plaintiff's operative complaint was filed on March 31, 2026. ECF No. 31. The Complaint alleges violations of Sections 10(b) and 20(a) of the Securities Exchange Act, 15 U.S.C. §§ 78j(b), 78t(a), on behalf of a class of purchasers of Dow common stock from January 30, 2025 through July 23, 2025.

## III. LEGAL STANDARD

Section 10(b) of the Securities Exchange Act and Rule 10b-5 "prohibit fraudulent, material misstatements in connection with the sale or purchase of a security." *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 570 (6th Cir. 2008) (quoting *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 680–81 (6th Cir. 2004)). "A private right of action for violations" of these provisions "exists where a plaintiff can demonstrate the following elements: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Ind. State*

*Dist. Council of Laborers v. Omnicare, Inc.*, 583 F.3d 935, 942 (6th Cir. 2009) (quoting *Stoneridge Inv. Partners, LLC v. Sci.–Atlanta*, 552 U.S. 148, 157 (2008)).

Heightened pleading standard. Because Section 10(b) "claims sound in fraud, the pleading strictures of Federal Rule of Civil Procedure 9(b) apply." *Id.* Pursuant to these strictures, a plaintiff "must state with particularity the circumstances constituting [the] fraud" that is alleged. Fed. R. Civ. P. 9(b). "Bolstering this rule of specificity, the PSLRA imposes further pleading requirements." *Ind. State*, 583 F.3d at 943. "First, the complaint must 'specify each statement alleged to have been misleading' along with 'the reason or reasons why the statement is misleading.' Second, plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" *Id.* (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)). At bottom, Plaintiff "cannot rest on speculation and conclusory allegations" to plausibly allege securities fraud. *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 553 (6th Cir. 1999) (citation modified).

Falsity pleading burden. A securities fraud plaintiff must "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Ind. State*, 583 F.3d at 942–43. Should a plaintiff fail to do so, the PSLRA requires dismissal of the claims. 15 U.S.C. § 78u-4(b)(3).

Scienter pleading burden. A plaintiff's particularized allegations must demonstrate that the alleged fraudulent statements were made with a "mental state embracing intent to deceive, manipulate or defraud.'" *Comshare*, 183 F.3d at 548 (quoting *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 (1976)). That means Plaintiff must do more than allege that because "something turned out badly [that] must mean defendant knew earlier that it would turn out badly"; endorsing such a theory of scienter "would be equivalent to the classic fraud by hindsight case." *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 484 (6th Cir. 2010) (citation modified). Instead, Plaintiff must provide specific allegations to show that Defendants knew, or were severely reckless in not knowing, at the time of each actionable statement that the statement was false or misleading. *Comshare*, 183 F.3d at 549. Courts in the Sixth Circuit consult a non-exhaustive list of nine factors in evaluating whether a plaintiff has adequately pleaded scienter for a Section 10(b) claim. *See Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039–40 (6th Cir. 2016) (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 552 (6th Cir. 2001)). In the end, the PSLRA-required "strong" inference of scienter must be "cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

Collective impact of relevant pleading standards. Collectively, "[t]hese requirements are purposefully demanding and have been described as 'exacting' and

as an 'elephant-sized boulder blocking a plaintiff's securities suit.'" *Lubbers v. Flagstar Bancorp. Inc.*, 162 F. Supp. 3d 571, 576 (E.D. Mich. 2016) (first quoting *Tellabs*, 551 U.S. at 313, and then *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 461 (6th Cir. 2014) as modified in original). They are designed to "curb perceived abuses of the § 10(b) private action—'nuisance filings, targeting of deep-pocket defendants, vexatious discovery requests and manipulation by class action lawyers.'" *Tellabs*, 551 U.S. at 320 (quoting *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 81 (2006)). Given these requirements, courts regularly dismiss securities fraud claims, particularly claims premised on the theory that a company "guaranteed" a dividend it did not pay. *See, e.g.*, *Walker v. L Brands, Inc.*, 2020 WL 6118467 (S.D. Ohio Oct. 16, 2020); *In re Dynagas LNG Partners LP Sec. Litig.*, 504 F. Supp. 3d 289 (S.D.N.Y. 2020); *In re Anheuser-Busch InBev SA/NV Sec. Litig.*, 2020 WL 5819558 (S.D.N.Y. Sep. 29, 2020); *Maeve Inv. Co. Ltd. P'ship v. Teekay Corp.*, 2017 WL 5158059 (W.D. Wash. Nov. 7, 2017).[3]

[3] Not only are securities class actions involving dividend reductions frequently dismissed, but *all* securities class actions are subject to a high dismissal rate given PSLRA's heightened pleading standards. Indeed, motions to dismiss were filed in 96% of securities class action cases brought between 2016 and 2025 and, among cases where a decision was reached, *62% of motions to dismiss were granted* (21% were partially granted and partially denied, and only 17% were fully denied). *See* Edward Flores et al., Recent Trends in Securities Class Action Litigation: 2025 Full-Year Review (Jan. 21, 2026), https://www.nera.com/insights/publications/2026/recent-trends-in-securities-class-action-litigation--2025-full-y.html.

Scope of considered materials. To evaluate whether the claims in this case have been adequately plead, the Court "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Tellabs*, 551 U.S. at 322; *see also Jawad v. Hudson City Sav. Bank, FSB*, 2014 WL 7272342, at *3 (E.D. Mich. Dec. 18, 2014) (similar). These sources include "full texts of SEC filings, prospectuses" and "other documents referenced in the complaint, regardless of whether they are attached" to the complaint. *Norfolk Cnty. Ret. Sys. v. Tempur-Pedic Int'l, Inc.*, 22 F. Supp. 3d 669, 675 (E.D. Ky. 2014). The Court also should judicially notice relevant investor analyst reports not referenced in the complaint—not for their truth, but for the fact that the information contained in them was known to investors. *See id.*; *In re Cardinal Health Inc. Sec. Litigs.*, 426 F. Supp. 2d 688, 713 (S.D. Ohio 2006); *Merzin v. Provident Fin. Grp., Inc.*, 311 F. Supp. 2d 674, 677 n.1 (S.D. Ohio 2004); *see also* AC at PageID.709 (noting Plaintiffs' allegations are based on review of "securities analyst reports concerning Dow").

## IV. **ARGUMENT**

The gravamen of Plaintiff's securities fraud claim is that Dow "guaranteed" in the first half of 2025 that it would ensure the cash it generated in FY 2025 (including $6 billion of cash levers) would be used to fund its dividend at $0.70 per

quarter for the entire year but, despite pulling those levers and having the available cash, nevertheless "knew" several months in advance that it would decide not to fund the dividend at that level and hid this information from investors. AC ¶¶ 11–13. This theory of fraud is nonsensical. Plaintiff does not identify any statements where Dow made this guarantee (to the contrary, the market clearly understood throughout the class period that a dividend reduction was possible), offer any cognizable motive for Defendants to have engaged in the alleged six-month fraud (which Defendants themselves "revealed" by reducing the dividend), or provide any facts suggesting that Defendants knew or should have known before the Board decision to reduce the dividend was made following Q2 2025 that a reduction would happen. In sum, Plaintiff's theory of fraud does not have a shred of factual support and his claims should be dismissed.

### A. PLAINTIFF FAILS TO PLEAD ANY ACTIONABLE MISSTATEMENT

Plaintiff fails to plead that Defendants made any actionable misstatements for several independent reasons. First, the alleged misstatements did not constitute a guarantee to pay a dividend of a particular amount but, instead, are the type of vague optimistic statements that courts routinely hold are immaterial to investors. Second, the alleged misstatements were accompanied by risk disclosures that informed investors that the dividend could be reduced. Third, the alleged misstatements also are inactionable because they were made *before* the payment of the quarterly

dividend of $0.70 on June 13, 2025 and therefore could not have been misleading when, in fact, the dividend was paid at the historical level. Finally, some of the alleged misstatements are clearly forward-looking and are protected by PSLRA's safe harbor for forward-looking statements ("PSLRA safe harbor").

### 1. Management Statements About Commitment to Paying a Dividend are Immaterial as a Matter of Law

On their face, none of the statements Plaintiff identifies as fraudulent included a guarantee to pay a dividend (or, for that matter, a dividend of any particular amount). *See supra.* Instead, Plaintiff contends that Dow *implicitly* guaranteed, because of the Company's prior dividend payments and its statements about having cash levers available to fund its dividend, that the Company would continue to pay $0.70 per share throughout FY 2025. *E.g.*, AC ¶¶ 3, 4, 11, 48. But there is a vast gap between stating that a dividend is a "priority" that the company has "the ability to pay" and guaranteeing that a dividend will never be reduced by even one cent. Simply put, a company cannot be held liable for optimistically stating that it believes it can continue to support its dividend.

As a threshold matter, Dow was clear that its dividend payments were subject to Board approval. *See* Ex. 1 at 31, 47 (the Company "has paid dividends on a quarterly basis and expects to continue to do so, *subject to approval* by the Dow Inc. Board of Directors" (emphasis added)). Because "management lacked the actual or apparent authority to guarantee the dividend," it "would be unreasonable for the

market to have interpreted the statements at issue as anything other than an individual's prediction about the future." *In re Int'l Bus. Machs. Corp. Sec. Litig.*, 163 F.3d 102, 107 (2d Cir. 1998). And that prediction is clearly inactionable.

Plaintiff's case is on all fours with the court's decision in *Walker v. L Brands, Inc.*, 2020 WL 6118467 (S.D. Ohio Oct. 16, 2020). In *Walker*, the plaintiff alleged that L Brands had paid a high dividend for a number of years and, during the putative class period, told investors that its "dividend is very safe," it had the ability to maintain the dividend, it was "confident that we can maintain the dividend," and it was "comfortable with the current dividend level in the business." *Id.* at *3–4. L Brands then reduced its annual dividend in half (from $2.40 to $1.20) and its stock price declined. *Id.* at *2.

The *Walker* court found that these statements about L Brands' dividend were inactionable. First, the statement that the "dividend is very safe" conveyed "soft information, as opposed to present fact" and was "too vague to be considered material." *Id.* at *10. At best the statement was a "loose prediction" that "in no way promises to maintain the dividend at any level." *Id.* at *11 (quoting *Int'l Bus. Machs.*, 163 F.3d at 109). Second, the statement about the company's ability to maintain the divided was "hard information" that was not false or misleading because "L Brands maintained the dividend thereafter at its prior level." *Id.* at *12. Finally, the statements about the company's confidence and comfort with maintaining the

dividend also were predictions and were accompanied by cautionary language that identified “the important factors that could cause confidence and comfort in the dividend level to change,” including changes to the company’s “cash position.” *Id.*

The alleged misleading statements in this case mirror the statements that the *Walker* court found were inactionable. As in *Walker*, Plaintiff alleges that Dow stated that it was “confident in in our ability to deliver on all our capital allocation priorities, including our industry-leading dividend” (AC ¶ 207), that there were “no significant restrictions limiting Dow Inc.’s ability to pay dividends” as of February 2025 (AC ¶ 209), that it was “committed to our dividend moving forward” (AC ¶ 211), that it had “unique to Dow cash levers” that could “support our capital allocation priorities with safely and reliably operating our plants and maintaining an industry leading dividend at the top of that list” (AC ¶ 215; *see also* AC ¶¶ 211, 217 (similar statements)), and that it intended “to pull all the levers we can to . . . support near term cash flow” (AC ¶ 219).[4] These statements are all either loose predictions

[4] In several spots in the Complaint, Plaintiff creatively edits alleged misstatements to make it seem like Dow was guaranteeing a particular dividend amount. For example, at the April 2025 Annual Meeting, Mr. Fitterling stated: “In addition, through these persistent macroeconomic challenges, we are continuing to take a wide range of proactive actions to help ensure that we can support our capital allocation priorities with safely and reliably operating our plants and maintaining an industry leading dividend at the top of that list.” AC ¶ 215. Plaintiff then converts the final part of that statement into: “‘maintain[] an industry leading dividend [of $2.80 a share]’ above all else.” AC ¶¶ 149, 216; *see also* AC ¶¶ 131, 207–08 (again inserting “$2.80 per share” into a statement). Of course, the statements Plaintiff contends are actionable must be “read in their entirety” and not “selectively quoted and taken out

(Dow's confidence in its ability to deliver dividend payments), hard information that was not misleading (Dow paid a quarterly dividend of $0.70 after stating in February 2025 that there were no restrictions on its ability to make that payment and the Complaint affirmatively pleads that Dow pulled the described cash levers to support its cash flow), and/or were accompanied by extensive information about how Dow was facing financial headwinds that were negatively impacting its cash flows and related ability to pay its dividend (*see supra*). The fact that in the face of a business downturn Dow's Board ultimately decided to preserve the Company's cash rather than pay it out as a dividend does not somehow convert these statements into securities fraud.[5]

Moreover, the *Walker* decision is no outlier. Courts regularly hold that corporate statements concerning the payment of a dividend are inactionable expressions of corporate optimism that a reasonable investor would not rely upon.

---

of context." *In re United Am. Healthcare Corp. Sec. Litig.*, 2007 WL 313491, at *10 (E.D. Mich. Jan. 30, 2007).

[5] Dow's use of the phrase "industry leading" to describe its dividend does not change the analysis. *See* AC ¶¶ 48–49. "Industry leading" is the precise sort of "vague and optimistic rhetoric" that appellate courts and courts in this Circuit frequently hold "constitute[s] corporate puffery" and is immaterial. *See City of Plantation Police Officers Pension Fund v. Meredith Corp.*, 16 F.4th 553, 557 (8th Cir. 2021) (phrase "industry-leading position" is puffery); *Miller v. Gen. Motors, LLC*, 773 F. Supp. 3d 461, 495 (E.D. Mich. 2025) (describing a company business product as "industry leading" is "puffery which is not actionable"); *NetJets Aviation, Inc. v. Perlman*, 2024 WL 4290258, at *11 (S.D. Ohio Sept. 25, 2024) ("Language that a business or product is 'industry leading' is classic, nonactionable puffery." (collecting cases)).

*See, e.g.*, *SLF H'ldgs, LLC v. Uniti Fiber H'ldgs, Inc.*, 499 F. Supp. 3d 49, 65 (D. Del. 2020) ("Uniti's statements describing the 'iron-clad' nature of Uniti's dividend" immaterial), *aff'd*, 2022 WL 3442353 (3d Cir. Aug. 17, 2022); *Maeve Inv. Co. Ltd. P'ship*, 2017 WL 5158059, at *3 ("Every statement of Defendant's described by Plaintiff as a 'guarantee' says that [the Company] was 'targeting' future dividend growth—there is nothing about a promise or guarantee."); *In re Seadrill Ltd. Sec. Litig.*, 2016 WL 3461311, at *11 (S.D.N.Y. June 20, 2016) ("statements predicting future dividends are inactionable statements of corporate optimism because they are generalizations that contain no long-term guarantee or assurance" and are "too indefinite to be actionable under the securities laws"); *Graff v. Prime Retail, Inc.*, 172 F. Supp. 2d 721, 728–30 (D. Md. 2001) (company's statements that its dividend was "sacred" and "sacrosanct," and that it was "committed to the current dividend" were inactionable), *aff'd sub nom. Marsh Grp. v. Prime Retail, Inc.*, 46 F. App'x 140 (4th Cir. 2002).[6] This Court should do the same.

---

[6] In *In re General Electric Co. Securities Litigation*, the court allowed claims to move forward where the company explicitly represented it would pay a dividend of exactly $1.24 per share and then did not do so. 857 F. Supp. 2d 367, 380 (S.D.N.Y. 2012) ("What can you count on? You can count on a great dividend, $1.24 board approved at the board meeting last Friday, $1.24 in 2009, $0.31 a share in the first quarter."). But "[t]he [dividend] statements in question here" when "read in their proper context, do not express a similar kind of guarantee." *Dynagas*, 504 F. Supp. 3d at 320.

### 2. Dow Disclosed the Factors That Impacted Its Ability to Pay a Dividend, Making the Alleged Misstatements Inactionable

Far from guaranteeing that it would continue to pay its dividend at its historic level throughout FY 2025, Dow expressly cautioned investors that its free cash flow, which it disclosed was the primary source of liquidity supporting its dividend payments, was being negatively impacted by macroeconomic forces. *See supra*. Indeed, on all the dates that Plaintiff contends Dow made misleading statements about its dividend, Dow also disclosed this contrary information, which carried significant weight in the market. *Id.* By Q2 2025, Dow also had expressly disclosed that (a) its dividend was a quarterly decision and it was engaged in an ongoing evaluation of the best use of its capital, and (b) it was not clear "how long" the Company could maintain its current dividend. Ex. 1 at 31, 47; Ex. 12 at 2; Ex. 13 at 10. These are the precise sort of "explicit[] warn[ings]" that make a reasonable investor aware that a dividend is not guaranteed. *Walker*, 2020 WL 6118467, at *13; *see also, e.g.*, *SLF H'ldgs*, 499 F. Supp. 3d at 65 ("SLF has failed to plead an actionable omission also because Defendants sufficiently disclosed the risks" relevant to its dividend payments); *Vaccaro v. New Source Energy Partners L.P.*, 2016 WL 7373799, at *6 (S.D.N.Y. Dec. 19, 2016) (risk disclosures adequately cautioned investors about factors that would impact dividend).[7]

---

[7] Plaintiff's suggestion that Dow needed to specifically caution investors that risks to its cash flows necessarily implied a risk to its ability to pay its dividend (AC ¶ 15)

Dow's investors got the message loud and clear. Contemporaneous analyst reports—which Plaintiff freely quotes when he deems them helpful but conspicuously ignores when they directly contradict his theory of fraud—readily connected the stress on Dow's free cash flow to the company's ability to pay its dividend at historical levels. *See supra*. Indeed, analysts highlighted prior to the dividend reduction that "a dividend cut is largely expected by the market and wanted by the majority of investors" (Ex. 14 at 2) and the "the prospect of a DOW dividend cut [is] now openly acknowledged by the company" (Ex. 16 at 1). Accordingly, any reasonable investor could not have been materially misled by Dow's class period statements about its dividend.[8]

---

was flatly rejected in *Vaccaro*, where none of the risk disclosures the Court found sufficiently warned investors about the company's "future ability to pay dividends" used the word "dividend." Instead, the company highlighted risks to its "cash flow" and "ability to obtain capital." 2016 WL 7373799, at *6.

[8] Plaintiff's scheme liability claim under Section 10(b) fails because it relies on "the same factual circumstances" and allegations "to make out both" scheme liability and "misrepresentation-and-omission claims," without identifying any deceptive conduct beyond the alleged misstatements themselves. *Teamsters Loc. 237 Welfare Fund v. ServiceMaster Glob. H'ldgs, Inc.*, 83 F.4th 514, 525, 533 (6th Cir. 2023); *see also Byrd v. ViSalus, Inc.*, 2018 WL 1637948, at *10 (E.D. Mich. Apr. 5, 2018) (no scheme liability where only fraudulent acts alleged are misstatements and omissions). In other words, the Sixth Circuit requires a plaintiff pleading scheme liability to identify deceptive acts distinct from making false and misleading statements, which Plaintiff has failed to do.

### 3. All of the Alleged Misstatements Were Made Before the June 13, 2025 Dividend Payment

Plaintiff's claims also fail because during the entire time that Dow allegedly made misleading statements about its willingness to continue to pay a $0.70 quarterly dividend, it was in the process of paying that exact dividend. In particular, Plaintiff contends that actionable misstatements were made from January 30, 2025 through June 5, 2025. AC ¶¶ 206–17. But Dow paid its $0.70 per share quarterly dividend on June 13, 2025, Ex. 2 at 51, consistent with its April 2025 dividend announcement. Ex. 7 at 5. Dow only declared that it would reduce its dividend on July 24, 2025. AC ¶¶ 193–95. Because Dow in fact paid the dividend at the level Plaintiff contends that Dow "guaranteed" through its alleged misstatements, those statements could not have been false when made and are inactionable. *See Int'l Bus. Machs.*, 163 F.3d at 107 (finding no material misrepresentation about the sustainability of a dividend where the company "maintained its dividend at its prior level" after each of the allegedly false statements were made); *Seadrill*, 2016 WL 3461311, at *11 (finding a challenged statement about a company's ability to maintain its dividend to be truthful where the company maintained its dividend for two months following the alleged misstatement).

#### 4. Certain Forward-Looking Statements Are Inactionable Pursuant to the PSLRA's "Safe Harbor"

PSLRA's safe harbor immunizes from liability forward-looking statements that are either: (1) accompanied by meaningful cautionary language, *or* (2) not made with "actual knowledge" of falsity. *Pension Fund Grp. v. Tempur-Pedic Int'l, Inc.*, 614 F. App'x 237, 242 (6th Cir. 2015); 15 U.S.C. § 78u-5(c)(1). Statements are forward-looking if they provide "projections of future events and results." *In re Kindred Healthcare, Inc. Sec. Litig.*, 299 F. Supp. 2d 724, 734, 738 (W.D. Ky. 2004).

At least three of the alleged misstatements in the Complaint clearly meet this definition and are forward-looking statements subject to the PSLRA safe harbor. The relevant statements are (with emphasis added):

- AC ¶ 211: We <u>remain committed to our dividend moving forward</u>. And with these capital levers that I just highlighted, as well as our really solid balance sheet and where we stand from a liquidity perspective, we're in a really good position to be able to support our dividend <u>for the next several years</u>.
- AC ¶ 215: And of that $6 billion, as Jeff mentioned earlier, the <u>vast majority of that will come in in 2025</u>. That will help support the dividend. But as the macro evolves, we'll have to <u>continue to</u> monitor and act in alignment with our capital allocation framework.
- AC ¶ 219: <u>[W]e intend</u> to pull all the levers we can to improve margins, support near term cash flow, and optimize our global portfolio.

Both of the safe harbor's prongs are applicable. First, the statements were accompanied by meaningful cautionary language (*see supra*) concerning the "precise factors" that caused the Company to suffer lower cash flows and negatively impact its dividend. *City of Pontiac Emps.' Ret. Sys. v. Stryker Corp.*, 865 F. Supp.

2d 811, 831 (W.D. Mich. 2012); *see also In re Keithley Instruments Inc. Sec. Litig*. 268 F. Supp. 2d 887 (N.D. Ohio 2002) (same). Second, Plaintiff offers no factual allegations suggesting that Defendants had actual knowledge prior to June 5, 2025 (when the last alleged misstatement was made), that the dividend would have to be reduced.[9] Accordingly, the PSLRA safe harbor requires the dismissal of any claims based on these statements.[10]

### B. PLAINTIFF FAILS TO PLEAD ANY FACTS GIVING RISE TO AN INFERENCE OF SCIENTER

To adequately plead scienter as to each Defendant, Plaintiff must provide specific allegations "to show that Defendants knew or could have known" at the time of each of their statements that Dow was going to reduce its dividend in July 2025 (provided this Court agrees that those statements were inaccurate and actionable in the first place). *Comshare*, 183 F.3d at 553. In making this assessment, the Court "must take into account plausible opposing inferences" based on all the facts

---

[9] The phrase "actual knowledge" appears twice in the Complaint, but those conclusory allegations do not make these statements actionable. *See* AC ¶¶ 230 (alleging actual knowledge of how the company was prioritizing its cash flow, but not that it would reduce dividend); 235 (alleging actual knowledge of misrepresentations and omissions with no supporting factual allegations).

[10] To the extent that Plaintiffs have failed to adequately plead scienter (*see* Section IV(B)), they also have failed to plead actual knowledge. *In re Overstock Sec. Litig.*, 2021 WL 4267920, at *7 (D. Utah Sept. 20, 2021) ("'actual knowledge' standard for forward-looking statements is more exacting than the scienter inquiry"), *aff'd*, 119 F.4th 787 (10th Cir. 2024).

properly before the Court and decide whether "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 323–24.

According to Plaintiff, Dow's management knew that it would not be paying its historical $0.70 quarterly dividend starting in July 2025, but nevertheless "guaranteed" investors that it would do so for six months before then announcing a reduction. AC ¶¶ 11–13. Defendants did this, according to Plaintiff, "to convince the market that Dow's high dividend yield—the highest in the S&P during the Class Period—meant the Company could afford an expensive dividend even during Dow's 'downcycle' in financial performance during the Class Period, thus indicating financial strength." AC ¶ 14. In other words, Plaintiff's scienter theory is that Defendants said that they could afford a high dividend so that they could convince the market that they could afford a high dividend, before shortly thereafter telling the market that they could not, in fact, afford a high dividend.

The Complaint does not contain a single document, witness statement, or shred of other factual support for this hindsight, and completely uncompelling, theory of scienter. *Ernst & Young, LLP*, 622 F.3d at 484 (Plaintiff must do more than allege that because "something turned out badly [that] must mean defendant knew earlier that it would turn out badly"; endorsing such a theory of scienter "would be

equivalent to the classic fraud by hindsight case"). Instead of facts, Plaintiff relies entirely on his own speculation, which requires the dismissal of his claims.

### 1. No *Helwig* Factor Supports An Inference of Scienter

Courts in the Sixth Circuit consult a non-exhaustive list of nine factors (the *Helwig* factors) in evaluating whether a plaintiff has adequately pleaded scienter for a Section 10(b) claim. *See Doshi*, 823 F.3d at 1039. Those factors focus on whether there are allegations relating to: (1) insider trading at a suspicious time or in an unusual amount; (2) divergence between internal reports and external statements on the same subject; (3) closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information; (4) evidence of bribery by a top company official; (5) existence of an ancillary lawsuit charging fraud by a company and the company's quick settlement of that suit; (6) disregard of the most current factual information before making statements; (7) disclosure of accounting information in such a way that its negative implications could only be understood by someone with a high degree of sophistication; (8) the personal interest of certain directors in not informing disinterested directors of an impending sale of stock; and (9) the self-interested motivation of defendants in the form of saving their salaries or jobs. *Id.* (quoting *Helwig*, 251 F.3d at 552).

Plaintiff makes no allegations of insider trading nor other improper stock sales (factors 1 and 8), and offers no evidence of bribery (factor 4) or an ancillary lawsuit

(factor 5). Plaintiff's allegations also do not concern the disclosure of specific accounting information (factor 7), rendering that factor inapposite as well. And the remaining factors do not create any inference of scienter because Plaintiff presents insufficient factual allegations to support them.

Internal reports and external statements / Most current factual information. Plaintiff baldly asserts that Mr. Fitterling and Mr. Tate possessed information regarding the risk that Dow would reduce the dividend or otherwise had access to financial information undercutting their public statements (factors 2 and 6). AC ¶¶ 223–29. It is not sufficient, however, to simply point to the Individual Defendants' positions and insist that they "must have known" that their statements were misleading. *Doshi v. Gen. Cable Corp.*, 386 F. Supp. 3d 815, 841 (E.D. Ky. 2019) ("Sixth Circuit law is clear: 'fraudulent intent cannot be inferred merely from the Individual Defendants' positions in the Company and alleged access to information.'" (quoting *PR Diamonds*, 364 F.3d at 688)).

Instead, to rely on supposed internal contradictory information, Plaintiff must allege with particularity: (a) the contents of the supposed reports, documents, or conversations containing that information (*In re EveryWare Glob., Inc. Sec. Litig.*, 175 F. Supp. 3d 837, 860 (S.D. Ohio 2016), *aff'd sub nom.*, *IBEW Local No. 58 Annuity Fund v. EveryWare Glob., Inc.*, 849 F.3d 325 (6th Cir. 2017)); (b) whether and how the contradictory information was "known to Defendants" (*Konkol v.*

*Diebold, Inc.*, 590 F.3d 390, 398 (6th Cir. 2009), *abrogated on other grounds by Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27 (2011)); and (c) whether the supposed contradictory information diverged "from public statements" (*Stein v. U.S. Xpress Enters., Inc.*, 2020 WL 3584800, at *34 (E.D. Tenn. June 30, 2020)).

In the Complaint, however, Plaintiff fails to identify *any* specific non-public contradictory information that existed concerning Dow's dividend at the time of the alleged misstatements (never mind whether that information was known to the Individual Defendants or diverged from Dow's public statements). While Plaintiff alleges that Dow's executives monitored the Company's cash flow and were "ultimately responsible" for the cash flow (AC ¶¶ 228–30), those contentions are "not specific" as to any contradictory information and courts routinely reject them as insufficient to create an inference of scienter. *See, e.g.*, *In re Diebold Sec. Litig.*, 2008 WL 3927467, at *8 (N.D. Ohio Aug. 22, 2008), *aff'd sub nom. Konkol v. Diebold, Inc.*, 590 F.3d 390.

To the extent Plaintiff also attempts to invoke a "core operations" theory to satisfy this factor—suggesting that the Individual Defendants must have known contrary information about the dividend decision because the dividend was "core" to Dow's investor relations and cash flow was "core" and "important" to its operations (AC ¶¶ 227, 230)—this too is unavailing. The Sixth Circuit has never adopted a "core operations" inference as sufficient to establish scienter. Indeed, the

"fact that executives are intimately familiar with a core component of their business does little to suggest fraudulent intent." *Pittman v. Unum Grp.*, 861 F. App'x 51, 55 (6th Cir. 2021); *accord Knurr v. Orbital ATK, Inc.*, 272 F. Supp. 3d 784, 800 (E.D. Va. 2017) ("monitoring company operations" is "part and parcel" of any executive's job and does not, "without more, support an inference of actual exposure to a problem as required to establish scienter").

Temporal proximity. Plaintiff suggests that the temporal proximity between the challenged statements and the dividend reduction supports finding scienter (factor 3). AC ¶ 232. But this allegation is particularly weak here: all of the challenged statements were made well before the July 2025 dividend announcement, all were made at a time that Dow was continuing to pay its $0.70 per share quarterly dividend, and Plaintiff alleges no facts suggesting a temporal nexus between any particular statement and the ultimate decision to reduce the dividend. *See In re NVE Corp. Sec. Litig.*, 551 F. Supp. 2d 871, 888 (D. Minn. 2007) (temporal proximity allegations are "weak" where "most of the allegedly misleading statements were made long before" the alleged corrective disclosure and "[t]hree months is not a particularly close temporal proximity"), *aff'd*, 527 F.3d 749 (8th Cir. 2008).

Motive. Plaintiff also contends that scienter is established by virtue of Defendants' supposed motivation to convince investors that Dow was "a financially healthy company" (factor 9). AC ¶ 234. But a general motive to have the company

appear successful is never sufficient to create an inference of scienter. "All corporate managers share a desire for their companies to appear successful. That desire does not comprise a motive for fraud." *PR Diamonds*, 364 F.3d at 690. And Plaintiff's suggestion that the Company failed to caution investors about the risks to its dividend payment in possible furtherance of this motive (AC ¶ 231), is simply wrong as explained at length above. *See supra* Section IV.A.2.

**2. When Viewed Holistically, Plaintiff's Scienter Allegations Fail to Create a Cogent or Compelling Inference of Scienter**

Taken holistically and examined in context, the facts properly before the Court tell a wildly different story than the one in the Complaint. *See supra* Section II. While Dow expressed public optimism that it would be able to continue to pay its dividend at historic levels using available cash levers, it also was candid with investors about the significant challenges it faced as to its financial performance and cash flow. The market understood that the dividend was decided on a quarterly basis and that these financial challenges could negatively impact Dow's ability to pay the dividend. Analysts contemporaneously understood that Dow's dividend remained under review and that a reduction had become increasingly likely. Upon full review of the Company's negative financial performance in Q2 2025, Dow's Board decided to reduce its dividend and promptly announced that decision to investors. Far from being surprised or believing that some guarantee had not been met, analysts described the divided reduction as "widely anticipated" and "expected." Ex. 19 at 1;

Ex. 14 at 2. In sum, the inference that Defendants engaged in non-fraudulent conduct related to Dow's dividend is overwhelming and Plaintiff comes nowhere close to adequately pleading scienter as to any of the Defendants.[11]

### C. THE SECTION 20(a) CLAIM FAILS

"Control person" liability requires plaintiffs to allege a "primary violation of the securities laws." *Doshi*, 823 F.3d at 1045. Here, Plaintiff fails to plead a primary violation of the Exchange Act (*see supra*) and his Section 20(a) claim fails too.

## V. CONCLUSION

For the foregoing reasons, Defendants' Motion should be granted with prejudice.[12]

---

[11] Because Plaintiff does not adequately plead the scienter as to the Individual Defendants, their scienter cannot be imputed to Dow as a corporate entity. *See Omnicare*, 769 F.3d at 483. While Plaintiff also attempts to impute scienter based on a meeting with Morgan Stanley that Andrew Riker, Dow's Vice President of Investor Relations, attended with other officers (AC ¶¶ 141–42, 237), that allegation is a non-starter. Plaintiff does not allege that Mr. Riker made any false statement and fails to provide any allegations suggesting that he acted with scienter. *See Picard Chemical Inc. Profit Sharing Plan v. Perrigo Co.*, 940 F. Supp. 1101, 1126 (W.D. Mich. 1996). Any assertion of "corporate scienter" (AC ¶¶ 235–37) thus fails.

[12] In the context of securities fraud claims, "the plain language of the [PSLRA] does not contemplate amending complaints; it *does* set a high standard of pleading which if not met results in a mandatory dismissal. The necessary goal of this plain, and strong language, is that it should be dismissed *with prejudice.* To conclude otherwise would be to abrogate the very purpose of the legislation." *In re Champion Enters., Inc., Sec. Litig.*, 145 F. Supp. 2d 871, 873 (E.D. Mich. 2001) (emphasis in original). Dismissal with prejudice is thus warranted.

Dated: June 22, 2026

Respectfully submitted,

*/s/ Jonathan E. Lauderbach*
Jonathan E. Lauderbach (P51313)
WARNER NORCOSS + JUDD LLP
715 East Main Street, Suite 110
Midland, MI 48640
Telephone: 989/698-3701
jlauderbach@wnj.com

Lyle Roberts
ALLEN OVERY SHEARMAN
STERLING US LLP
1101 New York Ave., NW
Washington, D.C. 20005
Telephone: 202/508-8108
lyle.roberts@aoshearman.com

Mallory Tosch Hoggatt
ALLEN OVERY SHEARMAN
STERLING US LLP
800 Capitol Street, Suite 2200
Houston, TX 77002
Telephone: 713/354-4800
mallory.toschhoggatt@aoshearman.com

*Counsel for Defendants*